## IN THE MATTER OF TAURUS F.

Docket No. 65140. Argued October 13, 1981 (Calendar No. 3).—Decided December 23, 1982. Rehearing denied 417 Mich 1104. Appeal dismissed by the Supreme Court of the United States on October 31, 1983.

The Department of Social Services petitioned the Washtenaw Probate Court to terminate the parental rights of Deborah Finney with respect to her daughter, Taurus, alleging that Mrs. Finney was unable to care for the child because she was in prison. At the time, the child was under foster care. Mrs. Finney contested the petition, and her sister, Michelle Thomas, offered to care for the child. The department investigated Ms. Thomas' home and found it to be suitable for foster care but unsuitable as an adoptive home, and refused to place the child in the home even for foster care. The department amended its petition and sought termination of parental rights on the grounds that Mrs. Finney was an unfit parent and that the child would be deprived of a normal home for more than two years because Mrs. Finney was in prison. Following trial, the probate court, Francis L. O'Brien, J., terminated Mrs. Finney's parental rights. The Washtenaw Circuit Court, Henry T. Conlin, J., affirmed. The Court of Appeals, D. F. Walsh, P.J., and D. E. Holbrook, Jr., and R. B. Burns, JJ., denied leave to appeal (Docket No. 49862). On appeal by Deborah Finney, the Supreme Court twice remanded the case to the probate court for findings of fact and recommendations for placement and for explication of the bases for the probate court's assumption of jurisdiction and disposition of the case.

The decision of the courts below is affirmed by an equally divided Court.

Justice Williams, joined by Justices Kavanagh and Levin, would hold:

The probate court did not have jurisdiction in the case and was without authority to terminate parental rights.

1. The probate court is a court of limited jurisdiction. Before

REFERENCES FOR POINTS IN HEADNOTES
[1] 42 Am Jur 2d, Infants § 33.
[1, 2, 5, 8] 59 Am Jur 2d, Parent and Child § 39.
[3-5, 8] 42 Am Jur 2d, Infants § 16.
[6, 7] 59 Am Jur 2d, Parent and Child § 43.

the court may consider termination of parental rights, its jurisdiction must be established. Under the Probate Code, the court has jurisdiction in proceedings concerning a child under 17 years of age who is without proper custody. In this case, no showing was made that the child was without proper custody.

2. A parent may place a child in the custody of a relative without intervention by the probate court, and the custody can be proper custody under the Probate Code where the child is adequately cared for. The provision of necessary support, education, and the care necessary for the health, morals, and well-being of the child is proper custody. Such custody is further characterized by the absence of neglect, cruelty, drunkenness, criminality, or depravity. Both temporary and permanent custody can be proper custody; it is the adequacy of the care given the child, rather than the nature of the placement which establishes proper custody. In this case, permanent placement of the child by Mrs. Finney with her sister would not be improper custody per se, nor would custody based on an agreement between Mrs. Finney and her sister conditioning placement on the sister's right to decide when and if the child should be returned to Mrs. Finney's custody.

3. The Department of Social Services had the burden of establishing that the child was without proper custody. The department's pleadings are inconsistent with respect to the existence of a custody agreement between Mrs. Finney and her sister. Originally, the department alleged that Mrs. Finney's relatives were unable or unwilling to care for the child. In its amended petition, it alleged that Michelle Thomas was willing to take custody of the child and that Mrs. Finney approved, but that Mrs. Thomas was unsuitable. The probate court found that no evidence was presented that Mrs. Finney agreed to conditions set by Ms. Thomas relative to taking custody of the child. The finding is legally insufficient to establish lack of proper custody and, thus, jurisdiction in the probate court. As long as it is not known whether the mother consented to her sister assuming custody, the department did not establish that proper custody was not available. Affirmative proof of the mother's refusal to consent is necessary. The department's determination that Ms. Thomas was not suitable for adoption also does not establish that the child was without proper custody. The Probate Code does not provide that suitability for adoption is a relevant criterion for providing proper custody.

Justice Coleman, joined by Chief Justice Fitzgerald and Justice Ryan, would hold:

1. The state makes a prima facie case that a child is other-

wise without proper custody under the juvenile chapter of the Probate Code when it shows that the parents or persons in actual custody of the child are not providing proper custody, and the burden shifts to the parents to show that other arrangements to provide proper custody have been made.

2. A parent may legally place a child in a relative's custody prior to intervention by the probate court. However, where, as in this case, the parent cannot provide proper custody and no agreement with a relative for permanent custody has been made, the probate court is justified in concluding that the child is without proper custody and assuming jurisdiction.

OPINION BY WILLIAMS, J.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — PROBATE COURTS — JURISDICTION.

   *Termination of parental rights in a child may not be considered by the probate court until the court's jurisdiction under the juvenile chapter of the Probate Code is established (Const 1963, art 6, § 15; MCL 712A.2[b]; MSA 27.3178[598.2][b]).*

2. PARENT AND CHILD — PROPER CUSTODY — PROBATE COURTS.

   *A parent may place a child in the custody of a relative without intervention of the probate court, and the custody can be proper custody under the juvenile chapter of the Probate Code where the child is provided with adequate care (MCL 712A.2; MSA 27.3178[598.2]).*

3. PARENT AND CHILD — PROPER CUSTODY.

   *Proper custody of a child under the juvenile chapter of the Probate Code is custody which provides necessary support and education, and the care necessary for the health, morals, and well-being of the child; and in which neglect, cruelty, drunkenness, criminality, or depravity are absent (MCL 712A.2[b]; MSA 27.3178[598.2][b]).*

4. PARENT AND CHILD — PROPER CUSTODY.

   *Both temporary and permanent custody can be proper custody under the juvenile chapter of the Probate Code; it is the adequacy of the care, rather than the nature of the placement, which establishes proper custody (MCL 712A.2; MSA 27.3178[598.2]).*

5. PARENT AND CHILD — PROPER CUSTODY.

   *The placement of a child by the parent in the custody of a relative on the condition that the relative has the right to decide when and if custody of the child should be returned to*

*the parent is not improper custody per se under the juvenile chapter of the Probate Code (MCL 712A.2; MSA 27.3178[598.2]).*

6. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — BURDEN OF PROOF.

*In an action to terminate parental rights in a child, the petitioner has the burden of proving that the child is without proper custody; failure to establish that no other relative is available to care for the child or asserting that a relative willing to provide such care is unsuitable for adoption is insufficient to establish lack of proper custody under the juvenile chapter of the Probate Code (MCL 712A.2; MSA 27.3178[598.2]).*

OPINION BY COLEMAN, J.

7. PARENT AND CHILD — PROPER CUSTODY — PROBATE COURTS — JURISDICTION — BURDEN OF PROOF.

*A prima facie case that a child is otherwise without proper custody under the juvenile chapter of the Probate Code is made when it is shown that the parents or persons in actual custody of the child are not providing proper custody; the burden then shifts to the parents to show that other arrangements to provide proper custody have been made (MCL 712A.2[b][1]; MSA 27.3178[598.2][b][1]).*

8. PARENT AND CHILD — PROPER CUSTODY — PROBATE COURTS — JURISDICTION.

*A parent legally may place a child in a relative's custody without intervention by a probate court; however, where the parent cannot provide proper custody and there is no evidence that an arrangement with a relative for permanent custody has been made, the probate court is justified in concluding that the child is without proper custody and that it has jurisdiction (MCL 712A.2[b][1]; MSA 27.3178[598.2][b][1]).*

*William F. Delhey,* Prosecuting Attorney (University of Michigan Child Advocacy Law Clinic, by *Ellen M. Tickner,* of counsel), for the petitioner.

Wayne County Neighborhood Legal Services (by *Robert F. Gillett)* and Women's Justice Center (by *Jan C. Leventer)* for the respondent.

*James Ridella,* guardian ad litem.

Amici Curiae:

*Edward M. Wise* for American Civil Liberties Union Fund of Michigan.

*Beatrice M. Friedlander* for Prison Legal Services of Michigan, Inc.

WILLIAMS, J.

## INTRODUCTION

This is a case of first impression concerning the termination of parental rights. It considers the right of a mother to give custody of her child to a sister without court intervention, and the character that such custody may take. It also considers what criteria must be applied to establish probate court jurisdiction on the basis that the child in question is "otherwise without proper custody" under MCL 712A.2(b); MSA 27.3178(598.2)(b).[1]

The case arises from the efforts of a mother who gave birth to a child while incarcerated to place that child in custody with the mother's sister. The sister was willing to accept custody, but only on the condition that the sister be allowed to retain permanent custody or until she thought the mother was sufficiently rehabilitated to properly care for the child.

The case raises four novel issues involving the interpretation of MCL 712A.2(b); MSA 27.3178(598.2)(b), which establishes the criteria for a probate court taking jurisdiction over a child. The probate court must establish its jurisdiction before it may consider termination of parental

[1] The text of this provision is set out below, p 532.

rights. Specifically, all four issues involve interpretation of the criterion for jurisdiction that the child is "otherwise without proper custody".

These four novel issues are:

(1) May custody in the mother's sister constitute "proper custody"?

(2) May permanent or conditionally permanent custody constitute "proper custody"?

(3) May the state satisfy the criterion "otherwise without proper custody" by the probate court finding that "there was no evidence presented at trial that Deborah F _____ [the mother] agreed to Ms. Thomas' [the sister's] conditions" of custody?

(4) May the state prove that the sister is not a "proper" custodian by showing that the sister's home was not suitable for adoption?

The facts and record in this case are both somewhat difficult and muddled for four reasons. First, factually, the probate court found it difficult to ascertain definitively under what conditions the sister would accept custody and whether the mother was agreeable to those conditions. Second, legally, the probate court did not directly address whether the sister could take custody under the conditions she set. Third, legally, there did not appear to be a clear understanding that the criterion for whether the sister was suitable for "proper custody" was established by § 2(b) rather than the criteria for foster care or for adoption. Fourth, and pervasively, the probate judge seemed not to recognize that the mother could give her sister custody without court intervention and that his duty was to try to establish his jurisdiction by

affirmatively finding that the sister's custody was improper under § 2(b) rather than to determine whether he should grant the sister custody as a court-approved foster parent or as an adoptive parent.

We hold: (1) that custody in a sister may constitute proper custody under § 2(b); (2) that custody in the sister with the mother's consent may constitute "proper custody" even though it is permanent custody with the right to decide when and if the child shall be returned; (3) that, since the state must affirmatively establish the basis for jurisdiction, the state must affirmatively prove non-consent of the mother; as a consequence the probate judge's finding that there was no testimony as to the mother's consent is insufficient to establish jurisdiction; (4) that the phrase "otherwise without proper custody" refers to "proper custody" under § 2(b), and since the probate judge appears to have employed not that but a different standard, namely whether the sister's home was suitable for adoption, the probate judge did not establish that the child was "otherwise without proper custody". In short, the probate court in this case did not acquire jurisdiction because the child was not shown to be "otherwise without proper custody".

Since the state did not properly establish jurisdiction, the probate court was without authority to proceed to terminate parental rights. Therefore, it is not appropriate for this Court to consider whether the probate court properly terminated parental rights under MCL 712A.19a(d); MSA 27.3178(598.19a)(d)[2] or whether § 19a(d) is constitutional.

[2] The text of this provision is set out in fn 5.

## I. STATEMENT OF FACTS

The parties agreed with, and the probate judge signed, the following concise statement of facts.

### "I. EVENTS

"1. In December, 1977, Mrs. Deborah Finney, the appellant, was referred to the Michigan Department of Social Services by the Michigan Department of Corrections, for the reason that she was pregnant and in prison.

"2. On March 17, 1978, a daughter, Taurus, was born to Deborah Finney at the University of Michigan Hospital, Ann Arbor, Washtenaw County, Michigan.

"3. Initially, Ms. Thomas, appellant's sister, was unwilling to take the child. The record indicates that she changed her mind, although she indicated that there were some conditions to this.

"4. On March 23, 1977, the Department of Social Services obtained an *ex parte* order from the Washtenaw County Probate Court, Juvenile Division, giving them authority to place Taurus in foster care.

"5. The Department of Social Services then filed a petition for termination of parental rights in the Washtenaw County Probate Court on March 29, 1978, which alleged that Deborah Finney was unable to care for the child or to provide care through relatives.

"6. On April 3, 1978, a preliminary hearing was held in the Washtenaw County Probate Court,

Juvenile Division. Mrs. Finney was unrepresented and made no statements except to request counsel. Mary Fransen, a student intern at the Department of Social Services, was the only person who testified. She testified that no relatives were able to care for Taurus Finney. The child was continued in foster care.

"7. At a second hearing, on April 10, 1978, Deborah Finney contested the termination, and Michelle Thomas declared that she was willing to care for Taurus.

"8. The hearing on April 10 was adjourned upon the agreement of the Department of Social Services, the guardian ad litem, and Deborah Finney, that a foster care study of Ms. Thomas' home would be undertaken.[3]

"9. The Department of Social Services' foster care study found Ms. Thomas' home to be suitable for foster care placement.

"10. The Department of Social Services later did an adoption study of Ms. Thomas' home and found the home to be unsuitable as an adoptive home site on the grounds that Ms. Thomas was in the process of obtaining a divorce, that she already had custody of three children, that she worked full time, and that she lacked a permanent and reliable babysitter.[4]

"11. The Department of Social Services refused to place Taurus Finney in Ms. Thomas' home on a

---

[3] While the department did find Ms. Thomas' home suitable for foster care, it should be noted that unsuitability for foster care or adoption is not the same thing as "otherwise without proper care" under § 2(b). See Part VI, below.

[4] See fn 3.

foster care basis even though the home was found suitable by Department of Social Services' own foster care study.

"12. The Department of Social Services amended its petition on July 18, 1978, and for the first time alleged that termination should take place because the mother had been convicted of felonies which proved her unfitness as a parent and, because she was imprisoned for a period of time, the child would be deprived of a normal home for more than two years, MCL 712.19a(d); MSA 27.3198(598.19a)(d). Exhibit C.

"13. A trial was held on July 31, 1978, and the probate judge terminated Mrs. Finney's rights for the reasons set forth in the amended petition.

"14. At trial, the guardian ad litem recommended against termination of the parental rights of the parents.

"15. Deborah Finney appealed the decision to the Washtenaw Circuit Court.

"16. At the trial, the guardian ad litem, James Ridella, recommended that temporary custody be continued, but not termination of parental rights. On appeal the guardian ad litem changed his position and recommended that the termination be upheld.

"17. The decision of the Washtenaw Circuit Court, affirming the probate court's decision, was signed on October 26, 1979. It was filed on October 31, 1979, and the clerk's notice was mailed on November 6, 1979.

"18. On November 21, 1979, an order signed by

Judge Conlin granted appellant an extra 20 days in which to file her appeal.

### "II. PERSONAL FACTS

"19. Mrs. Finney has two other children, a son being cared for by her grandparents and a daughter being cared for by her sister, Michelle Thomas. She sees both children on a regular basis.

"20. Deborah Finney saw her daughter Taurus two or three times at the prison before the hearing at which her parental rights were terminated.

"21. Deborah Finney is presently at Huron Valley Correctional Facility with an 'out date' of June, 1983.

"22. Deborah Finney was convicted of carrying a concealed weapon in 1973, and attempted possession of heroin and delivery of heroin in August, 1977."

The evidence offered at the trial also showed that Mrs. Finney had two other children, Aleka, a daughter born in 1976, born addicted to heroin or methadone, and a son, Alayho, born in 1968. Taurus, her third child and the subject of these proceedings, was conceived after Mrs. Finney escaped from prison. The natural father, Martin Cowens, was also incarcerated. Deborah Finney was married to James Finney when Taurus was conceived and born. However, he has been absent for some time, and his whereabouts are unknown.

The probate court issued its opinion and order on August 24, 1978. The probate court concluded that the material allegations in the petition were substantiated, that the child was within the

court's jurisdiction on the basis of § 2(b), subds (1) and (2), and that the parental rights of Deborah Finney, Martin Cowens, the putative father, and James Finney, the legal father, should be terminated pursuant to MCL 712A.19a(d); MSA 27.3178(598.19a)(d).[5] It is important to note that the mother, Mrs. Finney, is the only person that has appealed the termination of parental rights to this Court. Therefore, we do not address any of the possible errors with respect to the termination of parental rights of the biological father and the legal father.

The probate court's decision was appealed to the Washtenaw Circuit Court, and, on October 26, 1979, the circuit court upheld the decision to terminate parental rights. The circuit court concluded that the probate court acted properly in finding that it had jurisdiction and did not abuse its discretion in its evaluation of the evidence presented. It found that there was sufficient evidence to establish the jurisdiction of the probate court as there was not conclusive evidence that the child's aunt was available to care for the child.[6] Once the circuit court decided the jurisdictional issue under MCL 712A.2(b); MSA 27.3178(598.2)(b), it reviewed the dispositional phase, *i.e.,* the termination of parental rights, and concluded that parental rights were properly ter-

---

[5] "Sec. 19a. Where a child remains in foster care in the temporary custody of the court following the initial hearing provided by section 19, the court may make a final determination and order placing the child in the permanent custody of the court, if it finds any of the following:

\* \* \*

"(d) A parent or guardian of the child is convicted of a felony of a nature as to prove the unfitness of the parent or guardian to have future custody of the child or if the parent or guardian is imprisoned for such a period that the child will be deprived of a normal home for a period of more than 2 years."

[6] We hold this conclusion to be legally erroneous. See below, Part V.

minated pursuant to the second criterion of MCL 712A.19a(d); MSA 27.3178(598.19a)(d). The court found that the parent was "imprisoned for such a period that the child will be deprived of a normal home for a period of more than 2 years". The court found first that the child was without a normal home at that time and second that given the mother's sentence she would not be released until 1985, thus depriving the child of a normal home for more than two years. The circuit court concluded that it was unnecessary to review the first criterion of § 19a(d), "[a] parent or guardian of the child is convicted of a felony of a nature as to prove the unfitness of the parent or guardian to have future custody of the child" as there was a sufficient basis for terminating the parental rights under the second criterion.

The Court of Appeals denied leave to appeal on April 23, 1980, for the reasons stated in the opinion of the circuit judge.

Deborah Finney then filed an application for leave to appeal in this Court. On October 3, 1980, this Court stated:

"On order of the Court, the motion to proceed in forma pauperis is considered and it is granted.

"The delayed application for leave to appeal is considered, and while it is being considered, this Court, pursuant to GCR 1963, 865.1(7) remands the case to the probate court for the County of Washtenaw for an evidentiary hearing and findings of fact by the probate judge as to (1) the current status of appellant, her sister, her husband, her daughter born March 17, 1978, and her daughter's natural father; (2) placement alternatives presently available. The probate judge also may make a present recommendation as to custody and placement. These findings and a transcript of proceedings are to be filed with the clerk of this Court within 60 days of the certification of this order."

A hearing on remand was held in January of 1981, and the probate court's findings of fact and recommendations were filed on February 2, 1981. The probate court stated that "[i]t is the court's unqualified recommendation that Taürus should remain in the foster home and that adoption should be pursued". We granted leave to appeal on March 27, 1981, and the matter was argued before us on October 13, 1981.

On July 7, 1982, this case was once again remanded to the probate court. The probate court was directed to explicate the basis for its assumption of jurisdiction pursuant to MCL 712A.2(b); MSA 27.3178(598.2)(b) and for its disposition of this matter pursuant to MCL 712A.19a(d); MSA 27.3178(598.19a)(d). The probate court was specifically "directed to make findings of fact concerning the propriety of a possible temporary * * * or permanent placement [with the child's aunt]".[7]

The findings of fact and explication of the court were received by this Court on September 7, 1982, and an amendment was received on September 9, 1982. Aided by the amplification by the probate judge of the record below, we proceed to consider the difficult issues presented by this case.

In passing, we are compelled to observe that, inasmuch as it is psychologically and socially of extreme concern that the child find *proper* placement with the parent(s) or a relative, or foster care, or in adoption in the shortest possible period

---

[7] This language "propriety of a possible temporary * * * or permanent placement [with the child's aunt]" was meant to require the probate court to make findings of fact whether temporary or permanent custody by the aunt would constitute "proper custody". The order's choice of language was unfortunate, however, because the word "placement" was sufficiently ambiguous to refer to placement by the mother or placement by the court. This Court had in mind placement by the mother, but the probate court very well may have interpreted it to mean placement by the court. See below, p 546.

of time, it is essential that the probate court not only act expeditiously, but with meticulous regard for all statutory requirements so as to (1) protect all rights and (2) avoid the possibility of appeal or (3) if appeal is necessary, have such a complete record with specific and substantiated findings that there can be accurate and swift appellate determination without appellate speculation as to the facts from not only a cold but also an incomplete record.

## II. NECESSITY OF A PROBATE COURT'S JURISDICTION

### A. *The Law*

The probate court cannot consider termination of parental rights without first establishing jurisdiction.[8] The probate court is a court of limited

---

[8] In its wisdom, the Legislature has developed the following statutory scheme to deal with the unfortunate situations that arise which may necessitate the termination of parental rights. When the juvenile division of the probate court receives information from any person alleging that a child falls within the statutory provisions of chapter 12A of the Probate Code of 1939, MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.,* which are designed to handle juvenile problems, the court may conduct a preliminary inquiry "to determine whether the interests of the public or of the child require that further action be taken". MCL 712A.11; MSA 27.3178(598.11). If the court concludes that formal jurisdiction should be acquired, the court authorizes a petition to be filed. Following any further investigation that the probate court deems necessary, the court may dismiss the petition or issue a summons requiring the person or persons who have custody or control of the child to appear before the court. If such person is other than the parent or guardian of the child, then the parent or guardian shall also be notified of the petition and hearing. MCL 712A.12; MSA 27.3178(598.12). Hearings are then held to determine whether the probate court has jurisdiction under MCL 712A.2; MSA 27.3178(598.2). If the determination is affirmative, the probate court may proceed and order such disposition as seems appropriate under the factual situation presented. MCL 712A.18; MSA 27.3178(598.18), MCL 712A.19a; MSA 27.3178(598.19a). In the order for disposition, the probate court is required to state whether the child is placed in the temporary or permanent custody of the court. If the child is placed in the permanent custody of the court, all parental rights are terminated. MCL 712A.20; MSA 27.3178(598.20). When the child is

jurisdiction. Its authority is derived from the Michigan Constitution and the Legislature through statutory enactments. *Fritts v Krugh,* 354 Mich 97; 92 NW2d 604 (1958).

Article 6, § 15 of the Michigan Constitution of 1963 provides:

"The jurisdiction, powers and duties of the probate court and of the judges thereof shall be provided by law. They shall have original jurisdiction in all cases of juvenile delinquents and dependents, except as otherwise provided by law."

The pertinent statutory provision, MCL 712A.2(b); MSA 27.3178(598.2)(b), reads:

"Sec. 2. Except as provided herein, the juvenile division of the probate court shall have:

*    *    *

"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county

"(1) * * * *who is otherwise without proper custody".* (Emphasis added.)

## B. *The Pleadings*

The initial petition[9] in this case was filed on

placed in temporary custody of the probate court, hearings must be held periodically to determine whether the child is to remain in foster care or whether consideration should be given to permanent placement. See MCL 712A.19; MSA 27.3178(598.19).

[9] The petition must conform to the statutory requirements of MCL 712A.11; MSA 27.3178(598.11) which provides:

"The petition shall be verified and may be upon information and belief. It shall set forth plainly the facts which bring said child within the provisions of this chapter, and shall state (1) the name, birth date, and residence of the child; the names and residence: (2) of the parents; (3) of his legal guardian, if there is one; (4) of the person or persons having custody or control of the child; and (5) of the nearest known relative if no parent or guardian can be found. If any of the facts herein required are not known to the petitioner, the petition

March 29, 1978, and provides in relevant part the following facts:

"I [Paul Thiefels, caseworker] further represent upon information and belief that said child _____, on or about, to-wit, the 28th day of March, A.D. 1978, in said County of Washtenaw comes within the provisions of Act No. 54, Public Acts of Michigan, 1944, First Extra Session as Amended: being MCL 712A.2(b) whose parent legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, *or who is otherwise without proper custody or guardianship to wit: the mother is presently detained in the Huron Valley Women's Facility; that the mother will remain incarcerated at least until 1985; that the mother is unable to provide adequate care for the child through relatives; that the known relatives are unable or unwilling to care for the child; that the putative father of the child is incarcerated at Camp Cusino in Shingleton, Michigan; that the putative father will remain incarcerated until* May, 1979; that the best interest of said child requires termination of parental rights and placement for adoption. Said child is therefore subject to proceedings under Chapter XIIA, § 2(b) of the Probate Code." (Emphasis supplied.)

The original petition was amended on July 18, 1978, and further states:

"I further represent upon information and belief that said child _____, on or about, to-wit, the 18th day of July, A.D. 1978, in said County of Washtenaw comes within the provisions of Act No. 54, Public Acts of

shall so state. If the child attains his seventeenth birthday after the filing of the petition, the jurisdiction of the court shall continue beyond his seventeenth birthday and the court shall have authority to hear and dispose of the petition in accordance with the provisions of this chapter."

The petition contains the name, birth date and residence of the child and the names and residence of her parents as required by this statute.

Michigan, 1944, First Extra Session, as Amended: whose parent legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, or who is otherwise without proper custody or guardianship to wit: that the mother has been convicted of felonies such as possession of dangerous weapons and drugs; that the mother is presently detained in the Huron Valley Women's Facility; *that the mother will remain incarcerated at least until 1985, in excess of two years; that the mother claims one relative, Michelle Thomas, her sister, is willing as of the moment to take custody of the child that placement with this aunt is unsuitable for reasons that the aunt is in the process of obtaining a divorce, has custody of three young children, works full time, and lacks a permanent and reliable babysitter; that given these circumstances the aunt is incapable of providing adequate care and supervision for a four-month-old child;* that the biological father has been convicted of felonies such as attempted armed robbery and possession of dangerous drugs; that he will be subject to incarceration until May, 1979; that pursuant to § 19a(d), of Chapter XIIA, of the Probate Code the parents' respective convictions of the aforementioned felonies establishes their unfitness as parents; that the best interest of said child requires termination of parental rights in this proceeding and placement for adoption. Said child is therefore subject to proceedings under Chapter XIIA, § 2(b) of the Probate Code." (Emphasis supplied.)

The parties proceeded pursuant to the original and amended petitions,[10] and both were considered by the probate court. There were hearings in March, April, and June. Trial began July 31.

## C. *Probate Court Action*

On August 24, 1978, the probate court issued the following opinion and order:

---

[10] The guardian ad litem states:

"The matter went to trial, based on both the original and amended petitions."

"The mother of the above-named minor was convicted of delivery of heroin and possession of dangerous weapons. She is incarcerated in the Huron Valley Women's Facility and will be so incarcerated until at least 1985. During the period of her sentence the mother escaped from the correctional institution, and the above-named minor was conceived by Martin Cowans, also known as Thaddeus Russell. The above-named putative father has been convicted of possession of heroin and will not be released from minimum security until 1979. Testimony indicated that James Crawford Finney, husband of Debra Finney and legal father of Taurus F _____, has been absent and his whereabouts unknown for several years.

"The Department of Social Services, Protective Services, by its worker, Paul Thiefels, filed a petition requesting termination of parental rights. The child was born on March 17, 1978, at the Huron Valley Correctional Facility, located in Washtenaw County.

"On April 3, 1978, after a hearing before the referee, Robert M. Barrie, the court found that the conditions and surroundings under which the child was found are such as to endanger her health, morals or welfare, in that a prison for adults is not an appropriate place for the care and nurture of an infant, and the child was ordered placed in foster care under the supervision of the Department of Social Services.

"On July 31, 1978, a hearing was held and testimony taken concerning the neglect petition filed by the State Department of Social Services. The Court finds that the material allegations contained in the petition have been substantiated and further finds that the said child is within the jurisdiction of the court on the basis of § 2(b), subds (1) and (2).

"Disposition

"The court finds that both the natural mother and the putative father were convicted of felonies of a nature to prove their unfitness to have the future custody of the child, that both are imprisoned for a period, and that the child will be deprived of a normal home for a period of more than two years. The mother will not be released from prison until 1985, and the

father might be released in 1979; but, it is the opinion of the court that given their propensities to crime, their past convictions, and their unmarried state, if the child were placed with them, she would be deprived of a normal home for a period of more than two years.

"It is therefore ordered that all the parental rights of Debra Finney, also known as Michelle Hooks, Martin Cowens, also known as Thaddeus Russell, and James Crawford Finney, are hereby terminated."

D. *Discussion*

The probate court's opinion and order endeavored to meet the necessary statutory criteria. First, the third paragraph beginning "On April 3, 1978" makes a finding to establish the right of the probate court to take interim emergency custody of the child Taurus, presumably under MCL 712A.14; MSA 27.3178(598.14).[11] This section permits immediate custody of a child, *inter alia,* where "surroundings are such as to endanger his health, morals or welfare". Second, the next paragraph beginning "On July 31, 1978" refers to the

[11] Actually it is impossible to tell under what authority the probate court took temporary custody of Taurus. The probate court order following the above mentioned April 3, 1978, hearing does not specify whether it was acting under § 14 or § 15. Section 14 provides for a police or similar officer taking emergency custody of a child without prior court authorization. The fact the probate court in this instance issued an order relative to custody tends to argue it was operating under § 15, not § 14. But § 15 requires as a predicate to court action the filing of a complaint or petition. It does not appear in the court order or elsewhere in the record that such a complaint or petition was filed prior to the issuance of the order. As a consequence, it may be more appropriate to treat the action as a § 14 action, even with the intervention of the court. The use in the opinion and order of the § 14 language "such as to endanger [her] health, morals or welfare" in part supports that conclusion.
The pertinent text of MCL 712A.14; MSA 27.3178(598.14) follows:

"Sec. 14. Any municipal police officer, sheriff or deputy sheriff, state police officer, county agent or probation officer of any court of record may, without the order of the court, immediately take into custody any child who is found violating any law or ordinance, or whose surroundings are such as to endanger his health, morals or welfare."

justification for taking jurisdiction. Third, the final paragraph relates to findings necessary to terminate parental rights under MCL 712A.19a(d); MSA 27.3178(598.19a)(d) relating to a parent's incarceration.

At this juncture our consideration concerns the paragraph on jurisdiction. The probate court's findings of fact and conclusion of law are thus tersely stated:

"The court finds that the material allegations contained in the petition have been substantiated and further finds that the said child is within the jurisdiction of the court on the basis of § 2(b), subds (1) and (2)."

The full text of § 2(b), subds (1) and (2) for convenience is herewith set forth:

"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county
"(1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals, or who is deprived of emotional well-being, or who is abandoned by his parents, guardian or other custodian, or who is otherwise without proper custody or guardianship; or
"(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality or depravity on the part of a parent, guardian or other custodian, is an unfit place for such child to live in, or whose mother is unmarried and without adequate provision for care and support."

The statement that "the court finds the material allegations contained in the petition have been substantiated" is certainly general, conclusory and unhelpful, if not vague and inadequate, even al-

lowing for the pressure of case load on the probate court. To begin with, there are at least several different and even conflicting allegations in the petitions, and § 2(b), subds (1) and (2) also contain several different provisions. The reader of the opinion and order is thus left without adequate clue as to which allegations were material and which one or more of the statutory provisions are pertinent.

For example, the original petition alleged "that the known relatives are unable or unwilling to care for the child". The subsequent petition alleged that "Michelle Thomas * * * is unsuitable" as a custodian. Certainly these two allegations are in direct conflict. When the probate court opinion "finds that the material allegations contained in the petition have been substantiated", it is not possible to know for sure whether one or the other or both allegations were "substantiated".

Because of such problems, when the matter came to this Court's attention on appeal, we ordered that there be an explication of the probate court's opinion.

The probate court then made further findings of fact in response to this order. The pertinent portions thereof are:

"9. Deborah F _____ gave birth to Taurus on March 17, 1978, while serving her sentence at Huron Valley Women's Correctional Facility.

"10. At the time of trial, Deborah F _____'s earliest release date would occur on March 23, 1985, 6 years and 8 months from the date of trial.

"11. Inmates are not permitted to have physical custody of their child while incarcerated.

"Therefore, Deborah F _____ could not provide proper care for Taurus at the time of trial. .

"12. Michelle Thomas, sister of Deborah, was willing

to provide care for Taurus, but only under the conditions that the placement be permanent and that she be given authority to decide when and if Deborah was capable of regaining custody.

"13. There. was no evidence presented at trial that Deborah F _____ agreed to Ms. Thomas' conditions.

"Therefore, because her requirement for conditions could not be guaranteed by the court, Michelle Thomas was not available to provide temporary foster care for her niece.

\* \* \*

"19. No other relative was found who was willing to care for Taurus."

The probate court in its explication did not substantiate its reference to § 2(b)(2). It relied on the "proper custody" provision of § 1 in establishing jurisdiction.

On the one hand, these findings clearly establish that the mother, Deborah, was unavailable to provide "proper custody". She was shown to be incarcerated for 6 years and 8 months and there exists a rule against custody of children while incarcerated.

On the other hand, findings 12 and 13 concerning availability of care by relatives raise a number of questions. Was the sister unavailable to have custody

(1) because she was a sister? or

(2) because she demanded permanent or conditionally permanent custody? or

(3) because there was no evidence that the mother agreed to the sister's conditions? or

(4) because, reading together the probate court's first opinion and the second petition, the sister is an unsuitable custodian because "she is in the

process of obtaining a divorce" etc., *i.e.,* not suitable to adopt the child?

Before we address each of these four questions *seriatim,* let us briefly consider two statements made in the further findings of fact. The first statement is, "because her requirement for conditions could not be guaranteed by the court". The relevance of this to whether or not the custody is proper is not perceived. If the mother was willing to give custody, and the sister willing to receive custody, under these conditions, and the custody was otherwise "proper", it is not apparent what difference it makes whether or not the judge can guarantee the conditions. The second statement is, "Michelle Thomas was not available to provide *temporary foster care* for her niece" (emphasis supplied). This observation is not at issue. The issue is not whether the sister was "available to provide *temporary foster care",* the issue is whether *permanent custody* is "proper custody". For the reasons stated, we give no further consideration to these statements.

### III. CAN A SISTER PROVIDE "PROPER CUSTODY"? (QUESTION 1)

Actually, the point we will consider is more fundamental than "can a sister provide proper custody". The point we will consider is whether a mother can *without court intervention* give custody of her child to her sister, and whether that custody, if otherwise "proper", creates "proper custody". We hold that the answer to this double-barreled question is yes. Yes, if a mother gives custody to a sister, that can be "proper custody". Yes, a mother can give custody of her child to her sister without court intervention.

While there is no direct Supreme Court precedent for this question, there is helpful analysis by Justice LEVIN. There are also two opinions of the Court of Appeals directly on point. Justice LEVIN's observation provides the seminal rationale. In his opinion in *In re Maria S Weldon,* 397 Mich 225, 296; 244 NW2d 827 (1976), he said:

"Most parents raise their children themselves. Some parents, however, because of illness, incarceration, employment or other reason, entrust the care of their children for extended periods of time to others. This they may do without interference by the state as long as the child is adequately cared for. 'Clearly it is *not* the law that before a child can be placed by a parent in temporary custody of a relative permission must be first obtained from the court.' *Diernfeld v People,* 137 Colo 238, 242-243; 323 P2d 628, 631 (1958) (emphasis by the Court)."

More recently two Court of Appeals cases have specifically considered the "otherwise without proper custody" provision of MCL 712A.2; MSA 27.3178(598.2) where the parents had entrusted a child to relatives without court intervention. These cases relied in large part upon Justice LEVIN's observations and concluded that where a child has been given into otherwise proper custody of a relative the child is not "otherwise without proper custody" and the probate court cannot establish jurisdiction. *In the Matter of Carlene Ward,* 104 Mich App 354, 357-360; 304 NW2d 844 (1981) (a sister); *In the Matter of Curry,* 113 Mich App 821, 822-826; 318 NW2d 567 (1982) (maternal and paternal grandmothers). We agree with the reasoning and conclusions in both cases. The latter one, as the instant case, involved incarcerated parents.

It is well to review thoughtfully the twice-ap-

proved language of Justice LEVIN in *In re Maria S Weldon,* p 296. He said:

"Some parents * * * because of illness, incarceration, employment or other reason, entrust the care of their children for extended periods of time to others. This they may do without interference by the state as long as the child is adequately cared for."

For our purposes, the importance of this statement is threefold. First, the parent can place the child "without interference by the state as long as the child is adequately cared for". Second, with respect to Part IV of this opinion, Justice LEVIN's statement establishes "proper custody" as custody where "the child is adequately cared for" rather than on a time basis. Third, the statement contemplates custody "for extended periods of time".

Incidentally, our conclusion as to the "properness" of a sister's custody is corroborated by the interpretation put on the statute by the state agency administering it. Such interpretation, of course, is always entitled to respectful consideration. *Ford Motor Co v State Tax Comm,* 400 Mich 499, 522; 255 NW2d 608 (1977). The Department of Social Services Manual, Item D-220(2), reads:

"When a child cannot return to his own parents, placement with relatives is to be considered."

In the instant case, after the department learned of the approaching birth of a child to a mother incarcerated for a period of years, they sought out relatives for placement.

Because of these reasons, we hold that a mother's placement of a child with a sister can be a "proper custody" without court intervention.

IV. Can There Be Proper Custody Where a
Sister Conditions Her Availability on (1)
Having a Permanent Placement and (2) Having
Authority To Decide When and If the Mother
Shall Regain Custody of Her Child? (Question
2)

If the mother gives her sister permanent custody
and authority to return or not return her child, is
that proper custody?[12] This is the question we now
consider.

---

[12] The following evidence on the record is illustrative of the conflict-
ing testimony presented at trial which led the probate court to
conclude that Ms. Thomas would only accept custody of Taurus with
certain conditions. The following answers were given by Michelle
Thomas in response to direct examination by Ms. Kathryn Sedo,
attorney for Mrs. Finney.

"Q. Did you ever tell anyone that you would not take care of
Taurus unless you could adopt her?

"A. No, not really. It was the way it was put. The way the
discussion went; that's the way, you know, she boiled it down to that I
wouldn't take her unless I could legally adopt. But, like I told her and
I am telling you now, I am willing to take the child and have legal
guardianship of her, but I would have the say in the matter as far as
the mother and father is concerned. They couldn't just walk out of
prison and take her, you know, without proving to me that, you know,
first they were able to handle a child.

* * *

"Q. Did you ever state to the foster care worker that the reason you
wanted—the reasons for wanting a—what you call a permanent
custody referring to the—(inaudible) West who came to visit you first,
to visit your home, the foster care worker, did you ever tell her that
you wanted some type of custody arrangement where you could have
the child permanently and that Deborah could not come and take the
child from you?

"A. I just said—okay. Let me say this again. I would take the child,
have legal guardianship; the parents could come and get the child on
the weekends, take her, you know, for the weekend, what have you;
when they can prove to the court and to me that they are able to take
the child then they can take the child.

"Q. I see. Did you make any statements to the foster care worker
about your sister's activities or your feelings toward your sister?

"A. What? What kind of statements?

"Q. About how you felt—did you ever—did you ever tell the foster
care worker that you felt that Deborah—

"A. I told the worker that I felt that at, if this position, if my sister

We have been presented with no case or text-
book authority, nor have we found any, answering

did get out, that she would not be capable of taking a child and that
she would have to prove to me that she was able to take care of a
child. Meaning staying off of drugs, quit hanging with her friends,
getting her a nice job, getting her a nice place to stay, and then she
could have her children back.

\* \* \*

"*Ms. Thomas:* I am saying, after you decide that he is capable of
taking the child and things don't work out on him keeping the child,
her living standards aren't right, things, you know, things fall apart
for him on his job, and what have you, then where does the child go
back to the state or back to me?

"*Judge:* That's something we will have—I can't—no decision can be
made according to the status of the child right now. We would have to
decide that at a later time. Does that make a difference to you
whether you are going to take the child or not?

"*Ms. Thomas:* Not really, but, I mean, I look at it this way. There is
no need for the child to be pulled back and forth when it is not
necessary, when she can just stay with me, and he can have visitation
rights."

The following paragraph of a letter was read into evidence by Mr.
Paul Thiefels, caseworker, Department of Social Services:

"*A.* Okay. It says 'Michelle has discussed the new baby with her
sister and has made her feelings very clear. Michelle is willing to take
care of the baby and raise it. The only condition is that the baby is
legally hers, and Deborah cannot come back after her incarceration
and try to take the baby. It would not be fair to the child, and the
foster care worker agrees with this. Since Michelle has taken care of
Aleka since birth and is trying to obtain custody, she does not want to
hassle with this again. The worker feels it is very realistic of Michelle
to feel this way. She does not want to raise two children with no
permanent rights, and have Deborah be able to take her away
whenever she wants. She did say that Deborah could visit the baby
whenever she wanted, and she would tell the child that Deborah was
—was her mother, but Michelle must have permanent custody of this
child.' "

Martin Cowens, the natural father, also testified as to Ms. Thomas'
desire to have permanent custody.

"*Q.* Did you ever ask any of Deborah's relatives to take care of—
take care of Taurus Finney?

"*A.* I talked to Michelle.

"*Q.* Excuse me.

"*A.* I said I have talked to Michelle Thomas.

"*Q.* What did you—what did you tell her in this conversation that
you have had with her?

"*A.* Well, she told me that she would take care of Taurus until I
was able—she would—she would take care of Taurus only if she could
adopt her. This is what she told me the second time. I talked with her
on two occasions. The second time she said she wanted to adopt her."

the question posed. We must therefore analyze the statutory provisions to determine what the Legislature intended. As a consequence, for convenience and review we again quote the pertinent part of § 2(b):

"Sec. 2. Except as provided herein, the juvenile division of the probate court shall have:

\*   \*   \*

"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county

"(1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals, or who is deprived of emotional well-being, or who is abandoned by his parents, guardian or other custodian, or who is otherwise without proper custody or guardianship; or

"(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality or depravity on the part of a parent, guardian or other custodian, is an unfit place for such child to live in, or whose mother is unmarried and without adequate provision for care and support."

In analyzing this text, the first conclusion must be that there is no time limitation specified in the phrase "otherwise without proper custody" or anywhere in § 2(b). The second conclusion must be that the Legislature has given a clear indication of what it considers "proper custody" by spelling out improper custody in terms of failing to provide what it considers proper custody.

For example, § 2(b)(1) begins by providing that the court may have jurisdiction where the "parent or other legally responsible person \* \* \* neglects

or refuses to provide proper or necessary support, education * * * care necessary for his health, morals, or * * * well-being". In other words, such neglect or refusal is improper custody warranting the court's taking jurisdiction. But presumably the provision of such support, education, and care would characterize "proper custody". Likewise, the opposite of the abandonment (in § 2[b][1]) of a child or providing an unfit home for a child because of "neglect, cruelty, drunkenness, criminality or depravity" (in § 2[b][2]) would characterize "proper custody".

The rule of *noscitur a sociis, viz.,* known by its associates, indicates that the catch-all phrase "otherwise without proper custody" must mean custody which is generally of the same category as the other improper custody described in § 2(b), subds (1) and (2), but not the same as any of them.

When we construe "otherwise without proper custody" then, it must be something other than without necessary support, education, and care necessary for health, morals, and well-being or in a home marked by cruelty, drunkenness, criminality, or depravity, but nonetheless something within the same general category. Does the fact that custody is temporary or permanent fall within such a category? We think not.

The definition of § 2(b), subds (1) and (2) obviously relates to something which clearly creates an environment hostile to the best interests and well-being of the child. Custody, either temporary or permanent, is not per se hostile to the well-being of a child. Whether a temporary or a permanent custody may be proper or improper for a child in a given case is dependent upon factors outside the time span per se.

Furthermore, since the juvenile chapter of the

Probate Code provides for both temporary and permanent custody, it is clear that the Legislature considered both temporary and permanent custody to be proper custody according to the other conditions of the matter. See § 20. As a consequence, we must conclude that custody is not per se improper because it is temporary or permanent.

We are further confirmed in our belief that the brevity or length of the custody is not per se critical to the properness of custody by the implications of § 1, which in pertinent part reads:

"This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, preferably in his own home, as will be conducive to the child's welfare and the best interest of the state and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to the care which should have been given to him by them."

This provision emphasizes that statutory construction shall be such as to best achieve the child's care in his own home. It would certainly seem that the best care would be permanent home care, and the next best care would be surrogate family home care. If the mother and her sister agree on permanent home care in the sister's home, certainly that, in the legislative priorities, would seem preferable to temporary or permanent care elsewhere.

Our analysis of the Legislature's intention after reviewing all the language of § 2(b) and other sections of the juvenile statute is that "proper custody" relates to the appropriateness of the care given the child and the character of the home rather than whether the custody is short or long. This, we believe, not only correctly determines

what the Legislature had in mind, but makes eminent good sense. What is important is whether the child receives proper care. If the parent who is about to give up custody is suffering from some temporary inability to provide proper care, then it would seem to be in the child's best interest as well as that of the parent that the custody also be temporary so that child and parent can be re-united within a reasonable time and preserve the family relationship and the child's best interest. However, if the parent is suffering not a tempo-rary, but a long or permanent disability, then it is probably in the child's best interest that the sepa-ration from the parent and the custody be perma-nent.

We would conclude therefore that a permanent placement with a sister would not per se be an improper custody. Likewise, we would conclude that a placement conditioned upon the sister hav-ing the right to decide when and if the mother should have the return of her child if the mother agrees to it is not per se improper custody.[13]

## V. No EVIDENCE THAT THE MOTHER AGREED TO THE AUNT'S CONDITIONS (QUESTION 3)

The probate court on remand for explication found:

---

[13] Let us examine some hypothetical possibilities of a parent grant-ing permanent custody to a relative. First, let us consider that the sole remaining parent is aged, wanting to give permanent custody to a brother or sister. It is hard to say that is not proper custody. Second, consider the parent who has ten children, and whose brother or sister has none and is most anxious to have a child. There certainly is nothing immoral or against public policy in giving such custody. Furthermore, if custody is given, it is logical that the custody be permanent, otherwise the child may suffer trauma by having to establish ties and then having them broken. Third, consider the parent who is unable because of health, poverty, or other reason to care for all or any of the parent's children, but who has a brother or sister fully able and anxious in every way to care for the child or children; is it immoral or against public policy for that parent to give permanent custody to the relative? We think not.

"13. There was no evidence presented at trial that Deborah F ——————— agreed to Ms. Thomas' conditions."

We must determine the legal significance of this finding.

Section 2(b) provides that the probate court shall have jurisdiction of a child who is "otherwise without proper custody". Lack of "proper custody" is therefore jurisdictional. The state must therefore establish jurisdiction by affirmatively proving that the child is "otherwise without proper custody".

Assuming that the finding "there was no evidence presented" is factually correct, that finding is, for two reasons legally insufficient to establish lack of proper custody and therefore jurisdiction in the probate court. First, it is the state's obligation in order to obtain jurisdiction in the court to prove that the child is "otherwise without proper custody", and, as long as it is not known whether or not the mother consents to the conditions of her sister's custody, the state has not satisfied its burden of proof that proper custody is not available.

Second, assuming that no evidence has been presented pro or con, then the state is confronted by its second petition which reads "the mother claims one relative, Michelle Thomas, her sister, is willing as of the moment to take custody of the child". This pleading reasonably indicates that the mother does approve of that custody, or she would not "claim * * * the sister is willing * * * to take custody". In any event, the state's petition took the claim seriously enough to deal with it by saying that the sister's custody would be unsuitable. In sum, the state's own pleading created an inference that the mother agreed to custody. Con-

sequently agreement might be assumed without proof to the contrary. As the court found no proof to the contrary, the inference of agreement remains.

In conclusion, this Court holds that the probate court's finding that "[t]here was no evidence presented at trial that Deborah F _____ agreed to Ms. Thomas' conditions" is legally insufficient to satisfy the state's obligation to prove that the child was "otherwise without proper custody".

## VI. DOES THE PROOF OF ADOPTION UNSUITABILITY ESTABLISH "OTHERWISE WITHOUT PROPER CUSTODY"? (QUESTION 4)

Before considering the question "Does the proof of adoption unsuitability establish 'otherwise without proper custody'?", it is essential to put this question into context with the general development of this case, or the question might seem somewhat irrelevant. The development of this case contains points of confusion and unexpectedness, because of a number of factors, including the apparent lack of appreciation by the probate judge of the parental right to place a child in the custody of another member of the family without the intervention of the court, the indecisive and perplexing action of the mother and sister in transferring custody of Taurus, the quick and ambiguous taking of custody of the child by the probate court, and the subsequent apparent assumption of that court that its duty was the proper placement of the child, although it had not established jurisdiction.

This case is confused first because the mother, Deborah Finney, and her sister, Michelle Thomas, seemed to have had difficulty in agreeing on the

exact conditions of the transfer of Deborah's child Taurus to Michelle. This prevented a speedy transfer between the sisters without court intervention before the probate court took custody of the child. We, of course, held that this transfer was their right in answering question 2. The indecisiveness of the attempted intrafamily transfer seemed to bother the probate court in determining whether it could "grant" custody to Michelle under the conditions the court believed she required. The probate court apparently never contemplated that the parent had the right to transfer custody to her sister without court intervention.

The combination of the failure of the sisters to effectuate a prompt transfer of custody and the speedy, although ambiguous, taking of custody by the court created a new confusion. Physically the sisters were no longer able to exercise their right of transfer, and the probate court failed to understand that its first duty was to establish jurisdiction by determining that Taurus was otherwise without proper custody rather than to attempt to determine whether placement with Michelle was proper, either for temporary foster care or adoption. After all, such an inquiry would seem somewhat anomalous as Michelle had had custody of another child of Deborah's for several years.

The nature of the probate court's confusion is illustrated in the following quotation from its findings of fact and explication of the court:

"Ms. Thomas was willing to say that she would take the child without adoption. Nevertheless, * * * she still expected a level of control and permanence which was inconsistent with foster care and which the court could not guarantee by any order other than adoption."

To begin with, the real question should have been, "Ms. Thomas, have you and your sister agreed on the transfer of the child?" If they had agreed, then any further question would be superfluous because of the mother's right to give her sister custody unless the probate court was prepared to find that custody in Ms. Thomas' home was not proper under § 2(b). If that were the case, by the same logic they would have to review the possibility of removal of the three children already in Ms. Thomas' home, her own two and Taurus' sister Aleka. The judge, apparently not appreciating the right of intrafamily transfer of custody, was trying to be helpful according to the law as he understood it. On the one hand, he considered temporary foster care, but erroneously concluded Michelle's "permanent custody" condition precluded any custody except possibly adoption. The court later considered the adoption alternative, and "the court was of the opinion that * * * it would not be appropriate to place * * * a four-month-old baby in the Thomas home". While kindly meant, neither the foster care inquiry nor the adoption inquiry, *i.e.,* did Michelle qualify as a foster parent or as an adoptive parent, were pertinent, for two main reasons: The first reason is that Michelle was not a candidate for foster or adoptive parenthood. The second reason is that the court's first task was to establish its jurisdiction under § 2(b), by determining whether the child was "otherwise without proper care", not to look for foster care or adoptive parents. This Court regrets that the unfortunate language of its order directing "findings of fact concerning the propriety of a possible temporary * * * or permanent placement with the child's aunt" may have misled the probate court into this erroneous analysis. This Court

was considering "placement" by the mother and "propriety" in relation to "proper care" under § 2(b). See fn 7.

This brings us to consideration of the question, "Does the proof of unsuitability for adoption establish 'otherwise without proper custody'?" As we have already indicated, in this case the probate court has, aside from this question, not established jurisdiction and, as a consequence, is not in a position to establish suitability or unsuitability for adoption, or anything else. However, looking beyond whether the question of adoptability could have been considered, it is possible to consider the issue whether a criterion to establish "otherwise without proper custody" could be whether the custodian was unsuitable for adoption.

So addressing ourselves to the question whether unsuitability for adoption can be a criterion to establish "otherwise without proper custody", we find that there are two reasons "otherwise without proper custody" does not contemplate the test of . unsuitability for adoption.

First, it is not possible to believe that the Legislature would have intended the catch-all phrase "otherwise without proper custody" to include so important and well-articulated a concept as adoption without specifically saying so.

Second, the criteria of § 2(b), child removal, and MCL 710.46; MSA 27.3178(555.46), child adoption, are completely different. Section 2(b) sets criteria for parents who fall so far below the level of proper care that they must be relieved of the custody of their children. On the other hand, MCL 710.46; MSA 27.3178(555.46) prescribes a triple-headed child adoption criterion relating first to the suitability of the child for adoption, second to the suitability of the parent for adoption, and third to

the suitability of the two to each other. Among the factors establishing the suitability of the potential adoptive parent is the "respective racial, religious and cultural backgrounds" of the child and the potential adoptive parent. In short, MCL 712A.2(b); MSA 27.3178(598.2)(b) and MCL 710.46; MSA 27.3178(555.46) have totally different objectives. A parent could avoid loss of a child under MCL 712A.2(b); MSA 27.3178(598.2)(b) criteria, but still not be suitable as an adoptive parent for a particular child under MCL 710.46; MSA 27.3178(555.46).

In view of these considerations, we hold that unsuitability for adoption is not a relevant criterion to establish "otherwise without proper custody".

## VII. CONCLUSION

We hold that the probate court acted improperly in terminating the parental rights of Deborah Finney because the department failed to establish jurisdiction in the probate court under the "otherwise without proper custody" criterion by showing affirmatively that Deborah and Michelle had failed to agree on a custody arrangement or that for purposes of MCL 712A.2(b); MSA 27.3178(598.2)(b) Michelle was an improper custodian.

If the mother and aunt can agree on the aunt taking custody of Taurus, and if the Department of Social Services does not disqualify the aunt under MCL 712A.2(b); MSA 27.3178(598.2)(b) (the department has not done so so far), then there would appear to be no reason why the question of Taurus' custody could not be speedily resolved by allowing Deborah to provide custody for Taurus through Michelle Thomas.

The situation becomes more complicated, however, if the mother, now released from prison, seeks custody for herself. First of all, the aunt can no longer supply the proper custody and thereby avoid probate court jurisdiction on that ground. The question then becomes whether the probate court has jurisdiction under § 2(b), subds (1) and (2) based on the mother's present possible disqualification for custody. The conclusory order and opinion of the probate court of August 24, 1978, stated "[t]he court finds that the material allegations contained in the petition have been substantiated and further finds that the said child is within the jurisdiction of the court on the basis of § 2(b), subds (1) *and (2)*" (emphasis added), which was conclusorily affirmed by the circuit court. When asked to explicate its order, the probate court referred to "proper custody", presumably referring only to subsection (1) of § 2(b). The explication emphasized that the child was alleged to be "otherwise without proper custody" because her mother was incarcerated. Now that the mother is no longer in prison and disqualified from custody under subsection (1), and the probate court has seemingly retreated from subsection (2), it is necessary to have the Department of Social Services and the probate court evaluate the present situation if the mother seeks custody in herself rather than in the child's aunt.

Fairness to all, especially considering that Taurus has been in foster care for four years, would dictate an effort to expedite the matter toward a final resolution of custody. As indicated, if the mother and aunt can agree on conditions of the aunt taking custody, the matter, it is hoped, could be quickly resolved by the following order: the Department of Social Services shall show cause in

writing before the probate court within 20 days of the date of this opinion why the child Taurus should not be transferred to the custody of her aunt, Michelle Thomas. The mother, Deborah Finney, and the guardian ad litem shall have 15 days from the filing of the department's writing to respond. Thereafter the probate court shall make its determination and issue its order within 15 days after the last filing has been made.

If the probate court finds that the Department of Social Services has *not* shown cause why custody of the child Taurus should not be transferred to the aunt, Michelle Thomas, then the probate court shall order the appropriate transfer.

As indicated above, if the mother seeks custody, the matter is more complicated. However, every effort should be made to reach an early resolution. The department, if it wishes to further pursue this matter, shall file its petition within 20 days. The mother and guardian ad litem shall have 15 days from the filing of the department's petition to respond. The probate court shall, if a hearing is required, set it at the earliest possible date, not later than 30 days. Thereafter the probate court shall proceed with expedition and render its opinion and order within 120 days of the filing of the department's petition.

This Court retains jurisdiction.

KAVANAGH and LEVIN, JJ., concurred with WILLIAMS, J.

COLEMAN, J. Nearly five years after her birth to an inmate of Huron Valley Correctional Facility, Taurus Finney remains in a foster home while lawyers debate and courts consider and reconsider her fate. It is argued that the probate court had no

jurisdiction *ab initio* and that all subsequent proceedings are a nullity. If the court had no such jurisdiction, as found by Justice WILLIAMS, we would have to agree with appellant that this Court also would have no authority by which to make orders concerning the child Taurus. Custody would revert to the mother, Deborah Finney (neither the putative father nor James Finney has appealed the termination). An entirely new process likely would commence, dependent upon the current situation of the mother.

Therefore, it is critical that we first determine whether the child is properly within the jurisdiction of the probate court. We are bound by the record at the adjudication hearing. If jurisdiction is established, the court proceeds according to JCR 1969, 8 to the "dispositional phase" during which determination is made as to whether the court will order temporary or permanent custody. MCL 712A.20; MSA 27.3178(598.20). If permanent custody is ordered, the child usually is placed or continued in foster (including relative) care until adoption procedure is in place. "A child shall not be placed in a home for the purpose of adoption until an order terminating parental rights has been entered", but that provision "shall not be construed to prevent a child placed in a licensed foster home from being adopted by the foster parent or parents". MCL 710.41; MSA 27.3178(555.41).

We would affirm the termination of parental rights on this record.

## I

The facts of this case are in dispute, but the record supports at least some basic determinations.

Taurus Finney was born on March 17, 1978, to Deborah Finney, who had been convicted of several felonies on separate dates: (1) carrying a concealed weapon, (2) attempted possession of heroin, and (3) delivery of heroin. She was imprisoned in Huron Valley Correctional Facility. Her first "out date" was said to be March 23, 1985, or possibly June, 1983. Deborah Finney had been incarcerated since October of 1976, but escaped briefly. During that time Deborah had intercourse with one Martin Cowens, also a prisoner convicted of possession of heroin, who was in minimum security. Taurus was born of this union. Mrs. Finney was married to James Finney, whose whereabouts are unknown.

Deborah Finney had two other children, Alayho, born June 22, 1968, and cared for by his maternal greatgrandmother, and Aleka, born April 14, 1976, addicted to heroin or methadone, as was Mrs. Finney at the time. Aleka has been cared for by Mrs. Finney's sister, Michelle Thomas, since birth. She has legal guardianship over that child.

It appears that the Department of Social Services tried to help the mother plan for Taurus. Commencing when appellant was 7-1/2 months pregnant, social workers met weekly with the expectant mother and visited with relatives, including Michelle Thomas, a sister, in an attempt to find someone willing to care for the baby. At first, this sister said she was unable to care for the child. Later, she said she would be willing to take the baby if the arrangements were permanent. Mrs. Finney would not agree to adoption. No petition has been filed in the probate division seeking legal guardianship, and nothing further

has been suggested or done by the mother to effectuate such a plan.

The probate judge terminated Mrs. Finney's rights after a hearing on July 31, 1978. Mrs. Finney appealed to the Washtenaw Circuit Court, which affirmed the determination of the probate court in a decision signed October 26, 1979. Taurus remained in the custody of the foster family with whom she initially was placed. Now, nearly five years later, Taurus apparently still is with this same foster family, who have expressed an interest in adopting her.

On April 23, 1980, the Court of Appeals denied Deborah Finney's application for leave to appeal. A delayed application for leave to appeal was filed in this Court and on October 3, 1980, the matter was remanded for an evidentiary hearing primarily concerning the present status of the appellant, her sister, her husband, Taurus and the putative father and placement alternatives then available. The probate judge could make a recommendation as to placement.

He did so after a hearing in January, 1981, and stated that "[i]t is the court's unqualified recommendation that Taurus should remain in the foster home and that adoption should be pursued".

Nevertheless, leave was granted and oral arguments heard (October 13, 1981). On July 7, 1982, this Court again remanded to the probate court for clarification and for findings of fact concerning possible placement with the aunt.

Again, we received findings of fact and explica-

tion of the court on September 7, 1982, with an amendment two days later.

## II

At the outset, there is no argument as to the legality of a mother's placement of a child with a relative prior to court intervention. However, that is not this case. The mother was in prison and no relative was available to take the child. The conditions of the sister for a permanent arrangement were not met.

The statute with which we are concerned provides:

"Except as provided herein, the juvenile division of the probate court shall have:

\* \* \*

"(b) jurisdiction in proceedings concerning any child under 17 years of age found within the county

"(1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals, or who is deprived of emotional well-being, or who is abandoned by his parents, guardian or other custodian, or *who is otherwise without proper custody* or guardianship; or

"(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality or depravity on the part of a parent, guardian or other custodian, is an unfit place for such child to live in, or whose mother is unmarried and without adequate provision for care and support." MCL 712A.2; MSA 27.3178(598.2). (Emphasis added.)

In this case, there is no disputing that Mrs. Finney could not herself provide proper custody for her

daughter. The only question is whether there existed proper custody with her sister such as to deprive the probate court of jurisdiction.

Under the "otherwise without proper custody" provision of MCL 712A.2(b)(1); MSA 27.3178(598.2)(b)(1), we conclude that the state makes a prima facie case that the child is "otherwise without proper custody" when it shows that the parents or persons in actual custody are not providing proper custody. Given such a showing, the burden shifts to a parent to introduce evidence that other arrangements to provide proper custody have been made. The parent's argument that her sister, Michelle Thomas, would provide adequate care for the child was in the nature of an affirmative defense. Placing the burden on the parent who asserts such an agreement avoids placing the Michigan Department of Social Services in the impossible position of having to show that such agreements do not exist, given the fact that any number of such possible alternative arrangements might be asserted.

In this case, the probate judge found no evidence that Mrs. Finney and her sister had reached an agreement for the sister to take custody. This finding is supported by the evidence. Therefore I cannot agree with my brother's factual finding that an "inference" of an agreement was created. Absent a showing of an actual agreement, the probate court was justified in concluding that Taurus was without proper custody, and that the court had jurisdiction.

With reference to the disposition, evidence of the mother's extensive incarceration for felonies involving crimes reflecting lack of fitness as a parent and of her long history of instability, addiction and criminality compels a conclusion supporting termi-

nation of parental rights. Mrs. Finney had not accepted responsibility for her other two children and there was no evidence that the pattern of her life would change. The child has not had the advantage of "bonding" with a parent excepting the psychological "bonding" with the foster parents of nearly five years. The party most affected by this matter is the child Taurus herself who is in danger of being severely hurt by the excessive duration of litigation leading to a permanent home.

Although there are other points in which we disagree with our colleague, our conclusion on this crucial issue is dispositive.

We affirm.

FITZGERALD, C.J., and RYAN, J., concurred with COLEMAN, J.

RILEY, J., took no part in the decision of this case.