# Order

Michigan Supreme Court
Lansing, Michigan

June 23, 2009

136988

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

_____

In re SKYLER LEROY MCBRIDE, ALEXANDER
GARAND MCBRIDE, and SAWYER DALE
MCBRIDE, Minors.

_____

DEPARTMENT OF HUMAN SERVICES,
        Petitioner-Appellee,

v

RONALD D. MCBRIDE, JR.,
        Respondent-Appellant,
and

SUSAN MCBRIDE,
        Respondent.
_____/

SC: 136988
COA: 282062
Bay CC Family Division:
  06-009381-NA

On order of the Court, the application for leave to appeal the July 15, 2008 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

CORRIGAN, J. (*dissenting*).

I would reverse the order terminating the respondent father's parental rights to his three sons. As the petitioner, Department of Human Services (DHS), concedes, respondent was unlawfully denied his right to counsel[1] and his right, as an incarcerated party, to participate by telephone in proceedings concerning his children.[2] Moreover, in light of these fundamental errors, the Michigan Attorney General (AG) and Solicitor General (SG) filed a brief amicus curiae[3] urging that reversal is required by Michigan

_____

[1] MCL 712A.17c; MCR 3.915(B)(1).

[2] MCR 2.004.

statutory law and court rules, as well as by federal constitutional law. I agree that a miscarriage of justice has occurred. I strenuously dissent from this Court's decisions to countermand its previous order directing oral arguments[4] and to now deny leave to appeal altogether.

## I. Facts and Proceedings

Respondent is the father of three sons who were 8, 10, and 13 years old, respectively, when these proceedings against their mother began in September 2006. Respondent has been incarcerated with the Department of Corrections (DOC) since 2004.[5] His earliest possible release date from prison is June 30, 2015. Upon his incarceration, his sons remained in the care of his wife, and their mother, Susan McBride. Respondent maintained his relationship with his children, who also had relationships with respondent's extended family; the family facilitated the children's visits with respondent in prison.

In September 2006 Susan was briefly jailed and the DHS sought temporary custody of the children. Susan was temporarily released from jail to attend the September 14, 2006, preliminary hearing, at which she was represented by court-appointed counsel. The children's maternal grandmother offered to care for the children for the duration of Susan's detention in jail, but the court determined that both Susan and her mother actively abused prescription drugs and were not fit to provide proper care. Accordingly, the children were placed in foster care. Respondent was notified of these events several days later.

---

[3] The AG notes that the local prosecutor shall serve as the legal consultant to the DHS in child protective proceedings, MCL 712A.17(5), and the AG has supervisory authority over local prosecutors, MCL 14.30. The AG also has general duties to prosecute suits involving state departments, MCL 14.29, and, through the SG, to represent the state in this Court, MCL 14.28. But here the AG has elected to participate only as an amicus curiae as he takes a position adverse to that of the Bay County Prosecuting Attorney, who represents the DHS.

[4] *In re McBride*, 763 NW2d 633 (2009); *In re McBride*, 483 Mich 892 (2009).

[5] Respondent was convicted of first- and second-degree criminal sexual conduct involving a minor. The victim was not one of respondent's children. Significantly, no statute requires termination of a parent's rights to his children merely on the basis of the nature of such convictions. MCL 712A.19b(3)(n)(*i*) permits termination if a parent commits certain offenses, including criminal sexual conduct, if the court *also* "determines that termination is in the child's best interests because continuing the parent-child relationship with the parent would be harmful to the child[.]" The DHS did not seek termination under this section.

On September 29, 2006, one day after her release from jail, Susan appeared at the adjudication hearing and admitted the allegations contained in the DHS's neglect petition. She admitted her ongoing drug problem, that she had refused in-patient mental health treatment, and that she had inappropriately struck her 15-year-old son in the face. The court determined that Susan was presently not able to care for the children, but ordered substance abuse services, counseling, and visitation with the goal of ultimately returning them to her care.

Although respondent had a right to communicate with the court by telephone in order to participate in the child protective proceedings, he was not informed of this right. He received notices concerning the hearings,[6] but the DHS and the court failed to comply with MCR 2.004(B) and (C), which require the DHS to move the court to arrange for telephonic communication with a respondent parent through the DOC.

Respondent's sister, Kelly McBride, did appear at the hearing. The record reflects that Kelly had regular contact with DHS workers between September 14 and 29 and had offered to care for the children in her home. The court rejected Kelly's request for placement with her, stating that although she "appears to be suitable," the court would not place the children with her because she lived more than an hour away from the children's current community; the court and the DHS preferred for the children to live closer to their mother and to remain in their current schools. Kelly then asked the court to permit the children to continue to visit their father in prison. When the court opined that it would be inappropriate to require foster parents to transport them, Kelly offered that she and the children's grandparents would drive them to the visits. The court denied her request with little further explanation.[7]

For almost a year, Susan attempted to comply with court orders and DHS services in order to regain custody of her children. But at the July 30, 2007, permanency planning hearing, the court concluded that she appeared unable to reform. She consistently

---

[6] Before August 2007, none of the notices and orders sent to respondent suggested that his parental rights were at issue. Rather, each stated that the goal of the proceedings was to provide temporary foster care for the children while Susan participated in services aimed at reunifying her with them.

[7] The court's refusal to permit visitation may have violated MCL 712A.13a and MCR 3.965. MCL 712A.13a(11) states that, until a petition for termination is filed, the court must permit "the juvenile's parent to have frequent parenting time" unless visits, "even if supervised, may be harmful to the juvenile . . . ." MCR 3.965(C)(6)(a) similarly states: "Unless the court suspends parenting pursuant to MCL 712A.19b(4) [because a petition to terminate parental rights has been filed], . . . the court must permit each parent frequent parenting time . . . unless parenting time, even if supervised, may be harmful to the child."

relapsed into drug addiction, and the children remained withdrawn and reported feeling unsafe with her. Without addressing the children's ages,[8] the court changed the goal of the proceedings to adoption instead of reunification with Susan. But it gave Susan 30 more days in which to try to prove that she could change her ways.

On August 27, 2007, the DHS petitioned for termination of Susan's *and* respondent's parental rights under MCL 712A.19b(3)(g), which permits termination

---

[8] A child's age affects whether he is likely to be adopted after his parents' rights are terminated. As of the November 7, 2007, date of termination in this case, respondent's sons were 9, 11, and 15 years old. Of the total adoptions in Michigan reported from October 1, 2006, to September 30, 2007, children aged nine and older comprised less than one-third of those adopted (31.48%). State of Michigan Department of Human Services, [Adoption and Foster Care Analysis and Reporting System] Adoptions by Federal Age Groups, October 01, 2006 - September 30, 2007, <http://www.michigan.gov/documents/dhs/AdoptionsByFederalAgeGroups-FY07_243181_7.pdf> (accessed June 8, 2009). Yet older children represent a higher percentage of those waiting to be adopted after their parents' rights have been terminated. For example, a DHS report states that, as of September 30, 2008, there was a "backlog" of 4,396 children who remained in foster care although their parents' rights had been terminated before January 1, 2008; of these children, 716 were 5 years old or younger, 925 were 6 to 11 years old, and 2,655 were 12 or older. Michigan Department of Human Services, Recent Developments in Child Welfare, May 4, 2009 (presentation to the State Court Administrative Office), pp 63-64, 66 <http://courts.michigan.gov/scao/services/cws/Materials/05-04-09-RDCWL.3.LL.pdf> (accessed June 8, 2009). Nationwide statistics similarly show that, in the fiscal year ending September 30, 2006, 56% of the total number of children in foster care (which includes temporary wards of the state and children awaiting adoption) were aged nine and older, but this age group comprised only 28% of total adoptions. The AFCARS Report, Preliminary FY 2006 Estimates as of January 2008, <http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar/report14.htm> (accessed June 8, 2009). The relative likelihood that an older child will *actually* be adopted is significant because it bears on the child's best interests. Even when statutory grounds for termination are present, under the former version of MCL 712A.19b(5) applicable here a court could terminate a parent's rights "unless . . . termination . . . [was] clearly not in the child's best interests." See *In re Trejo Minors,* 462 Mich 341, 352-353, 356 (2000) (MCL 712A.19b[5] "preserves to the court the opportunity to find that termination is 'clearly not in the child's best interests' despite the establishment of one or more grounds for termination"; the court may "consider evidence, within the whole record, that termination is clearly not in a child's best interests."). If adoption is unlikely, a child's best interests may be better served by continuing his relationships with his parents and extended family, particularly when the extended family is willing to take custody of him until the child reaches the age of majority.

when the "parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." The petition also sought termination of respondent's rights under MCL 712A.19b(3)(h), which applies when the

> parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

On September 18, 2007, respondent was personally served with a copy of the petition and with notice that the termination hearing would take place a few weeks later, on October 10, 2007.

At the termination hearing, for the first time the DHS and the court arranged for respondent to participate by telephone.[9] He immediately invoked his right to counsel, but the court denied his request.[10] He did not question his wife or the DHS workers who testified during the hearing, but testified by telephone on his own behalf, stating in part: "I love my children and I do not want to lose them. And I would love to hopefully have some sort of visiting rights and so would my parents and my other family members." He noted that the children had visited him before they were placed in foster care.

On November 7, 2007, the court issued an opinion and order terminating both parents' rights to their sons. Susan and respondent separately appealed, and the Court of Appeals affirmed in a split, unpublished opinion.[11] Dissenting Judge Gleicher would

---

[9] The court advised respondent that "the only reason we've got you here by telephone today is because the prosecutor's secretary thought that you should be present and set it up."

[10] As the Court of Appeals would later recognize, the trial court erred when it concluded that respondent waived his right to counsel by failing to assert the right earlier in the proceedings. A court is obligated to inform a respondent parent of his right to counsel— and to appoint counsel if necessary—"at the respondent's *first court appearance . . . .*" MCL 712A.17c(4) and (5) (emphasis added); see also MCR 3.915(B)(1)(a). Therefore, as the Court of Appeals majority concluded, "[t]o hold that a respondent waives his right to counsel by failing to request a court-appointed attorney before his first court appearance is inconsistent with the plain language of MCL 712A.17c(4) and MCR 3.915(B)(1)(a)." *In re McBride*, unpublished opinion per curiam of the Court of Appeals, issued July 15, 2008 (Docket Nos. 282062 and 282243), at 3 (*In re McBride I*).

[11] *In re McBride I*, *supra* at 1.

have reversed the order terminating respondent's parental rights. She opined that the DHS's and the court's failures to comply with MCR 2.004 and the complete denial of counsel required reversal because respondent's procedural and substantive due process rights were violated and, therefore, the court's resulting order "lack[ed] any inherent integrity . . . ." *In re McBride*, unpublished opinion per curiam of the Court of Appeals, issued July 15, 2008 (Docket No. 282062 and 282243), at 11 (Gleicher, J., dissenting) (*In re McBride I*).

## II. Discussion

I agree with Judge Gleicher, respondent, the AG, and respondent's numerous other amici curiae that reversal is required. Indeed, reversal is *mandated* by MCR 2.004(F). Accordingly, although I am also persuaded by respondent's arguments—which are consistent with Judge Gleicher's dissent and the AG's position—that his due process rights were violated, we need not even reach the constitutional question.[12] Further, although MCR 2.004(F) appears to require automatic reversal (as would the apparent constitutional violations),[13] without regard to whether respondent can show that the errors

---

[12] In the words of my concurring colleagues in *In re Rood,* 483 Mich 73 (2009)—in which my lead opinion addressed the constitutional implications of errors committed by the trial court and the DHS in a termination proceeding—here I am content to squarely conclude that the "numerous statutory and court rule violations" are "sufficiently egregious to require appellate relief." *Id.* at 130-131 (Young, J., concurring in part); see also *id.* at 125 (Cavanagh, J., concurring in part) ( "[T]he alleged due process violations arise out of the same state actions that resulted in statutory violations," and reversal is "clearly compelled by the statutes and court rules . . . ."); *id.* at 125 (Weaver, J., concurring in part) (reversal is required "both substantively and procedurally on the basis of Michigan law").

[13] The termination order foreclosed respondent's rights to have any contact with his sons and to contribute to their upbringing. It thereby permanently extinguished his constitutionally protected "fundamental liberty interest . . . in the care, custody, and management" of his children. *Santosky v Kramer,* 455 US 745, 753 (1982). The state must provide "parents with fundamentally fair procedures" in proceedings involving their fundamental parental rights. *Id.* at 754. Yet here, because of the violation of MCR 2.004 and the improper denial of his request for counsel, respondent was deprived of the most basic procedural protections available under Michigan law to a parent in his circumstances. Accordingly, I am persuaded by Judge Gleicher's conclusion that the "'commanding' liberty interests at stake here, in conjunction with the statutory and court rule mandates for appointed counsel, are entirely stripped of meaning if this Court employs a harmless error analysis." *In re McBride I*, *supra* at 8 (Gleicher, J., dissenting), quoting and citing *Lassiter v Dep't of Social Services of Durham Co,* 452 US 18, 27 (1981) ("A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one."). Further, although respondent

affected the outcome of the proceedings, respondent convincingly argues that the errors indeed substantially contributed to the court's decision and therefore were not harmless.

A. The parties concede that respondent's rights under MCR 2.004 were violated

MCR 2.004 requires the court and the petitioning party to arrange for telephonic communication with incarcerated parents whose children are the subject of child protective proceedings or termination petitions.[14] Significantly, the express purpose of

---

convincingly argues that the outcome of the case would have been different if he had participated in the proceedings or had been represented by counsel, in many cases errors such as those present here will effectively prevent a respondent from *ever* showing that his lack of participation and representation affected the outcome; because no one will have developed a record in support of his interests, it may be difficult if not impossible for him to provide an offer of proof to support his claim that the proceedings might have ended differently. It just so happens in this case that respondent's sister consistently advocated for ongoing relationships among the children, their father, and their paternal family and, therefore, the pretermination record contains proof that respondent had an ongoing relationship with his children and that he could potentially provide for their care and custody through his family, as I discuss further *infra*. On this point, I also note my disagreement with the conclusion of the Court of Appeals that the complete denial of a parent's statutory right to counsel may be harmless under these circumstances. *In re McBride I*, *supra* at 3. The majority in that case cited *In re Powers Minors*, 244 Mich App 111, 123 (2000), and *In re Hall,* 188 Mich App 217, 222-223 (1991), but neither of those cases involved the total deprivation of counsel or lack of counsel at a termination hearing. Indeed, the court in *In re Hall* reasoned that, even if the respondent mother had not waived her right to counsel during several review hearings, her attorney's absence from those hearings was harmless in part because she was represented by counsel at the termination hearing. *In re Hall, supra* at 222-223. As the DHS concedes, no Michigan case has held harmless a *total* deprivation of counsel, including at the termination hearing.

[14] MCR 2.004(A) to (C) provide:

(A) This rule applies to

(1) domestic relations actions involving minor children, and

(2) other actions involving the custody, guardianship, neglect, or foster-care placement of minor children, or the termination of parental rights,

in which a party is incarcerated under the jurisdiction of the Department of Corrections.

(B) The party seeking an order regarding a minor child shall

the rule is to engage the incarcerated party by telephone at the outset of the proceeding to determine

> (1) whether the incarcerated party has received adequate notice of the proceedings and has had *an opportunity to respond and to participate*,
>
> (2) *whether counsel is necessary* in matters allowing for the appointment of counsel *to assure that the incarcerated party's access to the court is protected*,
>
> (3) whether the incarcerated party is capable of self-representation, if that is the party's choice,
>
> (4) how the incarcerated party can communicate with the court or the friend of the court *during the pendency of the action*, and whether the party needs special assistance for such communication, including participation in additional telephone calls, and
>
> (5) the scheduling and nature of future proceedings, to the extent practicable, and the manner in which the incarcerated party may participate. [MCR 2.004(E) (emphasis added).]

---

(1) contact the department to confirm the incarceration and the incarcerated party's prison number and location;

(2) serve the incarcerated person with the petition or motion seeking an order regarding the minor child, and file proof with the court that the papers were served; and

(3) file with the court the petition or motion seeking an order regarding the minor child, stating that a party is incarcerated and providing the party's prison number and location; the caption of the petition or motion shall state that a telephonic hearing is required by this rule.

(C) When all the requirements of subrule (B) have been accomplished to the court's satisfaction, the court shall issue an order requesting the department, or the facility where the party is located if it is not a department facility, to allow that party to participate with the court or its designee by way of a noncollect and unmonitored telephone call in a hearing or conference, including a friend of the court adjudicative hearing or meeting. The order shall include the date and time for the hearing, and the prisoner's name and prison identification number, and shall be served by the court upon the parties and the warden or supervisor of the facility where the incarcerated party resides.

The AG observes that the enumerated purposes of the rule are consistent with traditional due process concepts of notice and opportunity to be heard.[15]

## B.  The remedy for violation of MCR 2.004 is reversal

With regard to a remedy for violation of MCR 2.004, MCR 2.004(F) explicitly provides: "A court *may not grant the relief requested* by the moving party concerning the minor child *if the incarcerated party has not been offered the opportunity to participate in the proceedings*, as described in this rule."[16]  (Emphasis added.)  I agree with respondent and the AG that the plain language of subrule F, combined with the rule's overall purposes, defies typical harmless error review.  MCR 2.004(F) affirmatively prohibits the trial court from taking action when the rule has been violated.  And the rule would be effectively meaningless if its enforcement depended on an imprisoned parent's ability to show, in hindsight, that his participation would have affected the outcome of the proceeding.  Such a requirement would rewrite the rule to require parental participation only upon proof that the parent likely could achieve an outcome in his favor; such a notion negates a parent's right to participate in proceedings involving his children and turns due process on its ear.

MCR 2.004(F) clearly requires reversal here.  Neither the DHS nor the court ever fulfilled its respective duty to arrange for respondent's participation.  And because respondent did not have an attorney to represent him, no one familiar with the law appeared on his behalf to ensure that the rule was enforced.  The enumerated purposes of the rule were never fulfilled and, as a result, respondent was totally deprived of the ability

---

[15] See *Dow v Michigan,* 396 Mich 192, 205 (1976) ("The fundamental requisite of due process of law is the opportunity to be heard.  The hearing must be at a meaningful time and in a meaningful manner.  The opportunity to be heard includes the right to notice of that opportunity.") (quotation marks and citations omitted).

[16] MCR 2.004(F) does not apply, even if the court or petitioning party failed to comply with a provision of MCR 2.004, under two circumstances: "if the incarcerated party actually does participate in a telephone call, or if the court determines that immediate action is necessary on a temporary basis to protect the minor child."  The latter exception arguably applied to the September 14, 2006, preliminary hearing because Susan had been jailed and the children were staying with their maternal grandmother, who the court concluded was not an appropriate custodian.  Otherwise, the DHS generally concedes that MCR 2.004 was violated, and it does not argue that respondent's belated participation by telephone at the termination hearing was sufficient to satisfy the first exception to MCR 2.004(F).  Indeed, by the time the termination hearing took place, the proceedings were effectively over; respondent's unrepresented telephonic participation at that time did not satisfy any of the purposes of the rule.

to participate in the proceedings.[17]  Accordingly, the court was prohibited from granting the DHS's petition for termination.  I would reverse on the basis of MCR 2.004(F) alone.

## C.  The errors were not harmless

Finally, even if it were incumbent upon respondent to show that violation of MCR 2.004 actually affected the outcome of the proceedings, he persuasively argues that the error was not harmless.  First, the error clearly qualifies for reversal under MCR 2.613(A), the harmless error rule.  MCR 2.613(A), which generally applies to civil proceedings—including child protective proceedings, see MCR 3.902(A)—provides:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

[17] Respondent also reasonably observes that, although *termination* of his parental rights was not initially at issue, his lack of opportunity to participate from the outset of the proceedings directly affected his constitutionally protected fundamental right as a parent to participate in decisions concerning his children's care and custody.  *Santosky, supra* at 753.  His lack of opportunity to participate also had broader ramifications for child welfare in Michigan.  For example, Michigan is at risk of losing significant federal funding under subchapter IV, part E, of the United States Social Security Act, 42 USC 670 *et seq.*—commonly called "Title IV-E" funding—as a result of failures to involve *both* parents in a child's case planning process *throughout* the proceedings.  Indeed, to avoid funding losses after the United States Department of Health and Human Services Child and Family Services review (CFSR) and Title IV-E review of Michigan court and DHS procedures, in 2004 the DHS established a Program Improvement Plan—or "PIP"—aimed at remedying our state's failures to engage fathers and seek out relatives in child protective proceedings.  *PIP General Information*, pp 26, 28, 32 <http://www.michigan.gov/documents/FIA-CFS-PIP-Narrative_106409_7.pdf> (accessed June 8, 2009) (CFSR review revealed failures "to conduct a thorough search or evaluation of relatives as potential placement resources or relatives had requested to be considered for placement and the agency failed to follow up," "[p]articular concern was expressed over the lack of consistent efforts to locate and involve fathers," and "[f]athers were not engaged in the case planning process even when their whereabouts were known.").  See also national expert Judge Leonard Edwards (retired) on the consequences, including funding losses, of states' failures to engage fathers in child protective proceedings.  Edwards, *Engaging Fathers in the Child Protection Process: The Judicial Role (Part 1)*, in American Bar Association: Child Law Practice, vol 28, no 1, pp 1, 6-10 (March 2009).

The court's decision to terminate respondent's constitutional parental rights after depriving him of the most basic procedural protections throughout the proceedings was certainly "inconsistent with substantial justice." Second, respondent has shown that his substantial rights were affected and that, absent the errors, the outcome of the proceedings likely would have been different.[18]

Respondent cites the DHS's statutory duties in child protective proceedings to "identify, locate, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional, and physical needs as an alternative to foster care," to subsequently "[m]ake a placement decision and document in writing the reason for the decision," and to "[p]rovide written notice of the decision and the reasons for the placement decision" to those involved including the "father" and "each relative who expresses an interest in caring for the child . . . ." MCL 722.954a(2).[19] Respondent makes a strong argument that placement with a paternal

---

[18] Respondent reasonably argues that the errors were of constitutional dimension and were preserved because he properly requested counsel—who could have moved *inter alia* for relief based on the ongoing violation MCR 2.004—at the termination hearing. Accordingly, he argues that the error must be reviewed for whether it was harmless beyond a reasonable doubt. *People v Carines,* 460 Mich 750, 774 (1999). But *even if* we assume that the violation of MCR 2.004 constituted a nonconstitutional error, respondent has shown that the error "more probabl[y] than not" affected the outcome. *Id.*, citing *People v Lukity,* 460 Mich 484 (1999). Indeed, even under the plain error standard for unpreserved errors, I am convinced that the violation of MCR 2.004 affected his substantial rights and "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Carines, supra* at 774.

[19] Michigan and federal law favor placement with relatives throughout child protective proceedings. MCL 712A.13a(10) ("[T]he court shall order the juvenile placed in the most family-like setting available consistent with the juvenile's needs."); MCR 3.965(E) (providing that at the preliminary hearing, the court "shall direct" the DHS to identify and consult with relatives pursuant to MCL 722.954a[2]); MCR 3.965(B)(13) ("The court must inquire of the parent . . . regarding the identity of relatives of the child who might be available to provide care."); 42 USC 671(19) (providing that states receiving funding under subchapter IV, part E, of the United States Social Security Act, 42 USC 670 *et seq.,* must "consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards[.]"). Indeed, after this case was decided the Legislature enacted new statutes aimed at encouraging and funding guardianships, including those by relatives. See, e.g., MCL 712A.19a(7) through (15). In particular, a parent may now explicitly avoid termination of his rights, although statutory grounds for termination are present, if the child is being cared for by relatives or if adoption is not an appropriate permanency goal. MCL 712A.19a(6)(a) and (b)(*i*).

relative—particularly his sister, Kelly—would have been very likely if the correct procedures had been followed. Indeed, the trial court clearly erred when it stated, in its November 7, 2007, opinion, that "[f]amily members were unwilling to step in after the mother's long period of addiction." To the contrary, Kelly requested custody, was in contact with the DHS and the court throughout the proceedings, and indeed appeared at the termination hearing along with respondent's mother. Nothing in the record suggests that the court or the DHS considered placement with Kelly or other paternal relatives after the court determined that reunification with Susan was inappropriate.

Further, the DHS and the Court of Appeals majority incorrectly assumed that termination was inevitable under MCL 712A.19b(3)(h). That statute does not automatically authorize termination merely because a parent will be imprisoned for more than two years. Rather, the statute permits termination if the

> *parent is imprisoned* for such a period that the child will be deprived of a normal home for a period exceeding 2 years, *and the parent has not provided for the child's proper care and custody*, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age. [MCL 712A.19b(3)(h) (emphasis added).]

The statute's use of the word "and" clearly permits a parent to provide for the child's proper care and custody although he is in prison; he need not personally care for the children.[20] Thus, respondent reasonably argues that the facts underlying the DHS's

---

[20] Michigan precedent supports the notion that a parent may achieve proper care and custody through placement with a relative. *In re Taurus F,* 415 Mich 512, 535 (1982) (Williams, J.) (equally divided opinion) ("[I]f a mother gives custody to a sister, that can be 'proper custody'".); *In re Weldon*, 397 Mich 225, 296 (1976) (Levin, J.) ("Some parents, . . . because of illness, incarceration, employment or other reason, entrust the care of their children for extended periods of time to others. This they may do without interference by the state as long as the child is adequately cared for."), overruled in part *Bowie v Arder,* 441 Mich 23, 43 (1992); *In re Curry,* 113 Mich App 821, 823-826 (1982) (incarcerated parents may achieve proper custody by placing a child with relatives); *In re Ward,* 104 Mich App 354, 360 (1981) (holding that a child "who was placed by her natural mother in the custody of a relative who properly cared for her, is not a minor 'otherwise without proper custody or guardianship' and thus she was not subject to the jurisdiction of the probate court" under MCL 712A.2). Michigan's Estates and Protected Individuals Code includes an extensive statutory scheme designed to establish guardians for minors—including guardians who are relatives—by appointment of the court *or by appointment of the minor's parents*. MCL 700.5201 *et seq.*

termination petition against him would have been negated—or would not have arisen in the first place—if respondent had participated earlier in the proceedings or had been represented by counsel; he or his attorney could have argued for placement with Kelly or another paternal relative. If such a placement had succeeded, termination would have been inappropriate, and respondent and his children would have been able to continue their relationship.

## III. Conclusion

For each of these reasons, I would reverse the order terminating respondent's parental rights and remand for further proceedings in the trial court. I would direct the trial court to appoint counsel for respondent and to fully consider placement with relatives and guardianship options, particularly with Kelly McBride.

KELLY, C.J., joins the statement of CORRIGAN, J.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 23, 2009

*Corbin R. Davis*

Clerk