# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LANNING, Minors.

UNPUBLISHED
March 14, 2017

No. 333046 and 333048
Gratiot Circuit Court
Family Division
LC No. 15-008101-NA

Before: CAVANAGH, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

In these consolidated appeals, respondents appeal as of right an order terminating their parental rights to their two children pursuant to MCL 712A.19b(3)(g) (failure to provide proper care or custody) and MCL 712A.19b(3)(j) (likelihood of harm if children returned to parents' home). We reverse and remand for further proceedings.

Respondents have a long history of involvement with child protective services (CPS) in multiple states with regard to several children. Respondent-father's parental rights to six other children were previously terminated. Respondent-mother's parental rights to two other children were previously terminated. Because of CPS involvement in the State of Washington with respect to the children at issue here, respondent-mother contacted a previous foster family member who she considered a sister, Ashleigh Miller, and Miller provided bus fare for respondent-mother and her family to come to Michigan. When respondents arrived in Michigan, petitioner, the Department of Health and Human Services, immediately became involved in this matter based on a referral it received from CPS in Washington.

On September 6, 2015, respondents entered into a safety plan with petitioner, which included that respondent-father not have any unsupervised contact with the children. On September 15, 2015, respondent-mother was arrested and jailed on a warrant for outstanding child support. At that time, petitioner obtained a power of attorney from respondent-mother which delegated to Miller the care and custody of the children and a second safety plan was entered into by respondent-mother and petitioner which included that neither she nor respondent-father would have contact with the children without prior consent. Thereafter, on September 28, 2015, respondent-mother consented to the suspension of her parental rights in favor of a limited guardianship placement with Miller. On October 27, 2015, a petition initiating this action was filed which indicated that the children came within the provisions of MCL 712A.2(b)(1) and (2), that it was contrary to the welfare of the children to remain with their parents, and the court was

-1-

requested to authorize the petition and remove the children—although the children did not live with respondents.

On November 9, 2015, petitioner filed a motion for direct placement of the minor children and requested the court to continue the children's placement with Miller—where they had been living since they arrived in Michigan.

On November 16, 2015, an amended petition was filed. The petition again alleged that the children came within the provisions of MCL 712A.2(b)(1) and (2), and sought the termination of both respondents' parental rights. The petition asserted that several statutory grounds for termination existed, and noted that respondents had failed to rectify the conditions that brought the children under the jurisdiction of the court.

A preliminary hearing was conducted on November 16, 2015. The petition was authorized by the court after respondent-mother waived the probable cause determination and a general denial was entered on her behalf. Petitioner requested that the children be removed from the care and custody of respondent-mother and, consistent with its motion for direct placement, requested the court to enter an order placing the children with Miller. Respondent-father was considered the putative father and, thus, could not object to the "removal" of the children from respondent-mother at that time. The court received the testimony of petitioner's caseworker, Brooke Mayer, who testified that it was contrary to the welfare of the children to remain in the care of respondent-mother because she had her parental rights to another child terminated in the past and she had a significant history of substance abuse, homelessness or insufficient housing, and had no means to take care of the children. Even the one-bedroom apartment she lived in was not suitable because it had no furniture. Mayer testified that it was contrary to the welfare of the children to remain in the care of respondent-father because he had his parental rights to six children terminated in the past and had a history of substance abuse, homelessness, and of not taking his medications for mental health and medical issues. The court interrupted the questioning of the witness to note that this was the first proceeding in this matter where the court would be addressing the removal of these children from the home. The court noted: "There is a related matter where the Court granted a temporary guardianship but at this point in time there has been no court order removing these children in a child protective proceeding out of this court."[1]

Thereafter, the court held that the request for removal was appropriate and was supported by the evidence provided at the hearing. The court noted that, as set forth in MCR 3.965, it needed to address whether it was contrary to the welfare of the children to stay in the custodial home and, in this case, that was the home of the mother.[2] The court noted that the mother was

---

[1] The order entered by the court after the preliminary hearing indicated that the children had not been removed prior to that hearing and an order to take the children into protective custody was necessary under the circumstances.

[2] MCR 3.965(B)(12) provides that, if the petition is authorized, the court must decide "whether the child should remain in the home, be returned home, or be placed in foster care pending trial."

living with the alleged putative father. The court then rendered its several findings, which were consistent with Mayer's testimony, and granted petitioner's request that the court take temporary custody of the children at that time. The court noted that typically it would place the children with petitioner for care and supervision, but in this case there was a request for continued placement with Miller and it was granted.

On January 14, 2016, because respondents contested the merits of the petition, an adjudication bench trial began with Miller's testimony. She testified that respondent-mother had been her mother's foster child, and she considered her a sister. Respondent-mother called her from Washington and asked to move in with her because of a CPS case. Miller testified that she purchased bus tickets for respondents, gave the Washington CPS worker her address, and let respondents stay with her and her husband Derek. Miller testified that petitioner discussed a guardianship, and respondents filled out papers to give her a guardianship over the children. She added that respondent-mother also gave her power of attorney over the children.

Respondent-father testified that he had 11 other children, and they were not in his care or custody. He admitted that he had moved to several states, including North Carolina, Nevada, California, and Washington before returning to Michigan. The Washington CPS became involved because of allegations that respondents used methamphetamine, had inadequate housing, and only fed the children Cheerios and milk. According to respondent-father, he previously had problems with drug addiction, but he had been clean for four years. He further explained that he took medication for bipolar disorder and schizophrenia, and that he received social security disability payments because of his mental disability. Respondent-father testified that, when they arrived in Michigan, petitioner met with them and they entered into a safety plan agreement. On September 28, 2015, he did sign a petition to give Miller a limited guardianship, explaining that they were homeless at the time and Miller could care for the children.

Respondent-mother testified that she had moved to Illinois, North Carolina, Nevada, California, and Washington before returning to Michigan with respondent-father. She admitted that CPS became involved with respondents in each state except Illinois. She had not worked in any of those states, and they relied solely on respondent-father's disability income which was currently $660 a month. They primarily lived in shelters, motels, or with friends. When they arrived in Michigan, she entered into a safety plan and, after she was arrested, she entered into a second safety plan with petitioner which included giving power of attorney to Miller. Respondent-mother further testified that after she got out of jail, she signed a petition to give Miller a temporary guardianship of the children which did not mean she was giving up her parental rights. She and her husband offered money to Miller, but Miller said petitioner told her that she could not accept money. According to respondent-mother, she had used methamphetamine about four years ago, but she was currently drug and alcohol free, had obtained employment as a cook earning $9 an hour, and was participating in parenting classes. She added that she and respondent-father felt that they were in a stable position.

---

In this case, the children were in Miller's home, not a home of respondents. And respondents did not live in Miller's home with the children.

Following oral arguments, the trial court found that there was overwhelming evidence that an allegation in petitioner's petition was proved by a preponderance of the evidence entitling the court to assume jurisdiction over the children. The court noted that the issue of jurisdiction is assessed at the snap-shot in time when the petition was filed, and does not take into consideration what the respondents had done since the petition was filed. The court cited respondents' long history of involvement with CPS in multiple states, as well as their financial and housing struggles in those several states whereby respondents had been unable to maintain appropriate and stable housing for their children. The court also noted that respondent-father's established history of mental illness and a seizure disorder, combined with the other circumstances of this case, allowed the court to take jurisdiction and provide protective measures for the children. Further, the court indicated that, while there was no evidence of current drug use, it could take jurisdiction based upon respondents admitted history of methamphetamine addiction and the history of neglect in combination with the other facts. Subsequently, the court entered an order holding that statutory grounds to exercise jurisdiction over the children existed under MCL 712A.2(b)(2) which, according to the court's order, is "an unfit home environment, by reason of neglect . . . ."

Subsequently, a four-day hearing regarding petitioner's request for the termination of respondents' parental rights was conducted and concluded with the trial court holding that clear and convincing evidence supported the termination of respondents' parental rights under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and MCL 712.19b(3)(j) (likelihood of harm if children returned to parents' home). The court also found that it was in each child's best interests to terminate respondents' parental rights. This appeal followed.

On appeal, both respondents argue that the trial court erred when it assumed jurisdiction over the children because the children were in the care of Miller who had a valid power of attorney at the time the petition was filed. We agree.

This Court reviews a "trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact[.]" *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 296-297.

In the case of *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014), our Supreme Court explained:

> In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase. Generally, a court determines whether it can take jurisdiction over the child in the first place during the adjudicative phase. Once the court has jurisdiction, it determines during the dispositional phase what course of action will ensure the child's safety and well-being. [*Id*. at 404 (citation omitted).]

Child protective proceedings are initiated when a petition is filed with the court that contains facts constituting an offense against a child under the juvenile code, i.e., MCL 712A.2(b). *Id*. at 405; see also MCR 3.961(B)(3). "To acquire jurisdiction, the factfinder must determine by a

preponderance of the evidence that the child comes within the statutory requirements of MCL 712A.2[.]" *In re Brock*, 442 Mich 101, 108-109; 499 NW2d 752 (1993). This Court has determined that MCL 712A.2 "speaks in the present tense, and, therefore, the trial court must examine the child's situation at the time the petition was filed." *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004).

This matter was referred to petitioner by Washington CPS. When respondents arrived in Michigan by bus on September 6, 2015, one of petitioner's caseworkers immediately engaged respondents and presented a safety plan with regard to the children. By September 15, 2015, petitioner obtained a power of attorney from respondent-mother which delegated to Miller the care and custody of the children and expired by its own terms in six months. At the same time, a second safety plan was entered into by respondent-mother and petitioner which included that neither she nor respondent-father would have contact with the children without prior consent. Thereafter, on September 28, 2015, respondent-mother consented to the suspension of her parental rights in favor of a limited guardianship placement with Miller.

On October 27, 2015, a petition initiating this action was filed which indicated that the children came within the provisions of MCL 712A.2(b)(1) and (2). A preliminary hearing was conducted on November 16, 2015, and concluded with the court finding by a preponderance of the evidence that a statutory ground to exercise jurisdiction over the children existed under MCL 712A.2(b)(2) and an order was entered consistent with that finding.

MCL 712A.2(b)(2) provides that the court may exercise jurisdiction over a juvenile "[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in." However, "at the time the petition was filed," *In re MU*, 264 Mich App at 279, the children resided with Miller, a fictive relative, who had power of attorney with regard to the children's care, MCL 700.5103, and had been appointed the children's limited guardian under MCL 700.5205. It is undisputed that the children lived with Miller and not with respondents at the time the petition was filed and there was no allegation that Miller's home was an unfit place for the children to live, MCL 712A.2(b)(2). Thus, respondents argue that the trial court improperly assumed jurisdiction by examining the respondents' home rather than Miller's home. Petitioner counters that a power of attorney does not nullify a court's ability to obtain jurisdiction over minors.

Both parties rely on the case of *In re Webster*, 170 Mich App 100, 102; 427 NW2d 596 (1988), in support of their opposing arguments. In that case, the petitioner filed a neglect petition on the same day that the respondent-mother executed a power of attorney in favor of the respondent-father who had not yet acknowledged paternity. *Id*. The *Webster* Court rejected the respondent-mother's argument on appeal that the power of attorney prevented the trial court from exercising jurisdiction. *Id*. at 105. The *Webster* Court explained:

> The jurisdiction statute focuses on the physical and mental well-being of the minor child and the child's possibly unfit home environment. This case is distinguishable from *In re Taurus F*, 415 Mich 512; 330 NW2d 33 (1982), reh den 417 Mich 1104 (1983), cited by respondents, since in *Taurus F* the respondent had entrusted her child to a responsible relative in a home suitable for

foster care. *Id*. at 542-543. Here, respondent[-father] could not properly even be considered a relative at the time the power of attorney was executed, since he continued to deny paternity until July 8, 1986[, which was after the adjudication]. Further, our review indicates that respondent[-mother's] execution of the power of attorney brought about no change in the child's actual custodial environment[; the respondent-mother had been living with the respondent-father at his parents' home and one basis for the petition was "inadequate housing arrangements for the child, who was sleeping in the closet on dirty blankets thrown on a filthy floor smelling of animal urine and littered with dog food and cereal boxes."]. Therefore we conclude that such execution was ineffective to nullify the court's properly obtained jurisdiction. [*Id*. at 106.]

The instant case is distinguishable from *Webster* and actually presents facts more similar to those in the case of *In re Taurus F*, 415 Mich 512; 330 NW2d 33 (1982). It is uncontested that respondent-mother executed a power of attorney in favor of Miller. Respondent-mother considered Miller to be her sister, and Miller explained that respondent-mother had been her mother's foster child at one time and she also considered respondent-mother to be her sister. But regardless of the lack of a true familial relationship, the power of attorney did change the children's custodial environment. The respondents and their children moved in with Miller on September 6, 2015, but respondents no longer resided with Miller after September 14, 2015. Thus, after signing the power of attorney on September 15, 2015, the children were solely in Miller's care. The children's physical environment did not change because they still resided at Miller's home, but their custodial environment changed because only Miller provided care and custody. Child protective proceedings protect children but the adjudicative phase "is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *In re Sanders*, 495 Mich at 405-406 (internal quotation marks and citation omitted). Given the circumstances in this case, we are left with a definite and firm conviction that the trial court clearly erred by exercising jurisdiction under MCL 712A.2(b)(2).[3] Because the trial court erred by exercising jurisdiction, we reverse the trial court's order terminating respondents' parental rights. See *Ryan v Ryan*, 260 Mich App 315, 343; 677 NW2d 899 (2004) ("Because the trial court never properly assumed jurisdiction, all orders based on the wrongful assumption of jurisdiction are void ab initio.")

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ David H. Sawyer
/s/ Deborah A. Servitto

---

[3] Having determined that reversal is warranted, we decline to reach respondent-mother's other argument on appeal.